Neil CONWAY and Joan Conway, his wife, and Neil Conway to the Use of Roadway Express, Inc., Plaintiffs,

v.

WHITE TRUCKS, A DIVISION OF WHITE MOTOR CORPORATION; Volvo White Truck Corporation, Successor Corporation to White Trucks, a Division of White Motor Corporation; and National Seating Company and John Doe Corporation, Defendants.

Civ. No. 84–0392.

United States District Court, M.D. Pennsylvania.

March 31, 1986.

Todd J. O'Malley, Scranton, Pa., for plaintiffs.

John R. Lenahan, Jr., Scranton, Pa., for defendants.

## OPINION

CONABOY, District Judge.

This products liability/personal injury case grew out of an injury the Plaintiff received when he was thrown about the cab of the truck he was driving as an employee of Roadway Express, Inc.

The truck (tractor) involved was manufactured and produced by White Trucks, a division of White Motor Corporation (hereinafter White)—and the Plaintiff's theory was a defective design of the cab. As a bankrupt, White was eventually dismissed from the lawsuit. Plaintiff proceeded against Volvo White Truck Corporation (hereinafter Volvo White) on the successor corporate liability theory.[1]

In a Memorandum and Order of October 15, 1985, this Court denied Volvo White's motion for summary judgment on the successor corporation liability theory, holding that certain facts necessary to that determination were in dispute.[2]

As the case proceeded, the parties agreed to a bifurcation of the issues for trial—and further agreed that this Court would try the issue of successor corporate liability of Volvo White non jury. The trial on the remaining issues of liability and damages was to be tried by a jury.

On January 28 and 29, 1986, a bench trial of the issue of successor corporate liability was held, and on February 6, 1986 this Court found in favor of the Plaintiffs and directed that judgment on that issue be entered in favor of the Plaintiffs and against Volvo White. The matter then proceeded to a jury trial on the remaining issues.

What follows is the Court's rationale and factual findings on the issue tried non jury.

### I. Findings of Fact

1. For decades White included a division which manufactured and produced large trucks known as tractors which are used to haul trailers in commercial activity on long distance runs.

2. White had other divisions which were involved in a variety of businesses apart from the trucking business.

3. In September of 1980 White filed a petition for reorganization with the United States Bankruptcy Court for the Northern District of Ohio.

4. With approval of the bankruptcy court, A.B. Volvo, a Swedish Corporation, purchased the truck manufacturing facilities of the bankrupt White Motor Corporation on September 1, 1981.

5. To carry on this new business a new corporation known as Volvo-White Truck Corporation was established by A.B. Volvo.

6. While White had five facilities in the United States at which it manufactured and produced tractors, at the time of its purchase by A.B. Volvo only three of these were active production sites.

7. A.B. Volvo purchased all three of these active production sites and, thus, ac-

1. National Seating Company also remained as a Defendant. On February 13, 1986 a jury returned a verdict in favor of the Plaintiff and against Defendant Volvo White only.

2. Pennsylvania substantive law controls this diversity action. See *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See also *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

quired the entirety of White's tractor producing capability.

8. A clause in the purchase agreement required that White Motor Corporation was to cease using the name White in any of its remaining corporate activities.

9. Some facets of the former White Motor Corporation survive as Northeast Ohio Axle Company.

10. Northeast Ohio Axle Company does not produce or manufacture any tractors of the type formerly produced by White Motor Corporation.

11. The aforementioned purchase agreement mandated that Volvo-White Truck Corporation would receive the entire inventory of trucks and parts which White Motor Corporation had on hand at the time of the sale and Volvo-White continued to use and/or sell all such items until the supply was exhausted.

12. Volvo-White continues to manufacture, produce, and sell the same vehicles formerly produced by White Motor Corporation with only minor and inconspicuous cosmetic variations.

13. Volvo-White markets said vehicles under the trade names of Road Boss I, Road Boss II, Road Commander, Road Expeditor, and Auto Car—the identical names which White had used to market these vehicles.

14. Volvo-White continues to service the same clients as the former White Truck Corporation and made extensive efforts to assure these clients that the tractors manufactured after the acquisition of White would be of the same specifications and quality as those manufacturing by White.

15. Volvo-White inherited many of the sales, administrative, and engineering personnel of White and continues to use them in the same capacities in which they labored for White.

16. Volvo-White has incorporated the name "White" and uses the same model names for the tractors it manufactures as did White in order to capitalize on the goodwill associated with that name in the trucking industry.

17. Volvo-White is a large corporate structure with sufficient finances and assets to assume all liabilities of the White Motor Corporation.

18. Although fewer trucks are now produced and the amount of manufacturing space available to Volvo-White is somewhat less than was available to the White Motor Corporation at the peak of its industrial life, Volvo-White Corporation, for all intents and purposes, carries on essentially the same business as the former White Motor Corporation.

## II.  Applicable Law

Regarding the substantive law on liability of a successor corporation, it has been the rule that a successor corporation does not assume the legal liabilities of the transferor corporation merely because of its succession to the transferor's assets. However, since *Granthum v. Textile Machine Works, et al.*, 230 Pa.Super. 199, 236 A.2d 449 (1974), was decided, Pennsylvania courts have recognized that there are four exceptional situations which can render a successor corporation liable for injuries caused by defective products manufactured by its predecessor. These are: (1) where the purchaser expressly or impliedly agreed to assume such an obligation; (2) where the transaction amounted to a consolidation or a merger; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction was entered into primarily for the purpose of escaping liability. *Granthum,* supra, at 201, 326 A.2d 449, citing *Shane v. Hoban, Inc.,* 332 F.Supp. 526 (E.D.Pa.1971).

As was noted in our Memorandum and Order of October 15, 1985, this Court agrees that Volvo-White does not fit into any of the aforementioned *Granthum* exceptions and cannot, therefore, be held liable under that case for the manufacturing foibles of White. However, as was similarly noted, the law on successor liability in this Commonwealth has undergone considerable change since *Granthum* was decided. It has become significantly more flexi-

ble and the importance of the character of a transaction which terminates a corporation, formerly a factor of paramount importance, has been drastically deemphasized. The law of Pennsylvania on successor liability is now expressed in *Dawejko v. Jorgensen Steel Company*, 290 Pa.Super. 15, 434 A.2d 106 (1981), a very well-reasoned and exhaustively researched opinion.[3]

Before commenting on what we perceive to be the consequences of *Dawejko,* supra, it seems appropriate to discuss the cases and concerns which led to that decision which, of course, was not made in a vacuum, but was, rather, the logical culmination of the law's reaction to an obvious social need. We speak of the need to vindicate the underlying purpose of strict tort liability which is "... to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by injured persons who are powerless to protect themselves." See *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901 (1963).[4]

The concept outlined above—frequently referred to as "risk-spreading"—motivated the First Circuit to rule that a "continuation exception"[5] exists which should result in imposition of successor liability upon a successor corporation which

> ... was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from and exploiting all of the accumulated goodwill which the products have earned, both in its outward representations of continuity

and in its internal adherence to the same line of equipment. See *Cyr v. B. Offen & Co., Inc.,* 501 F.2d 1145, 1154 [(1st Cir.1974)].

The *Dawejko* Court was also impressed with the logic of the California Supreme Court in the now famous decision in *Ray v. Alad Corporation,* 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977). *Ray,* supra, held that strict liability should be imposed upon a successor to a manufacturer if three circumstances were shown:

(1) the virtual destruction of the Plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business;

(2) the successor's ability to assume the original manufacturer's risk-spreading role; and

(3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business. Cited in *Dawejko,* 290 Pa. Super. at 22–23, 434 A.2d 106.

Finally, the *Dawejko* Court noted that the New Jersey Supreme Court had decided to adopt a new exception to the general rule that successor corporations are not strictly liable for the manufacturing errors of their predecessors. This new exception—the "product-line" exception—was described as follows in *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981):

> ... Where one corporation acquires all or substantially all the manufacturing as-

---

**3.** The Third Circuit Court of Appeals has cautioned its district courts that changes in "basic tort law" should emanate from the Supreme Court and not the Superior Court. See *Vargas v. Pitman Manufacturing Company,* 675 F.2d 73, 76 (3rd Cir.1982). We are, thus, obliged to determine whether the Pennsylvania Supreme Court will ultimately reach the same result reached by the Superior Court in *Dawejko,* supra. In light of the Pennsylvania Supreme Court's sensitivity to the necessity of risk-spreading to assure that all citizens who are innocently injured have an avenue of redress—

see *Ayala v. Philadelphia Bd. of Education,* 453 Pa. 584, 305 A.2d 877—we feel confident in stating that the Supreme Court will affirm the Superior Court's decision in *Dawejko.* We note, too, that another district court has already reached this decision. See *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033 (1982).

**4.** Cited in *Dawejko,* 290 Pa.Super. at 22, 434 A.2d 106.

**5.** Cited in *Dawejko* at 20, 434 A.2d 106.

sets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor. 86 N.J. at 358, 431 A.2d at 825, cited in *Dawejko*, 290 Pa.Super. at 23, 434 A.2d 106.

The *Dawejko* Court then adopted this "product-line exception and stated at page 26, 434 A.2d 106:

> ... We also believe it better not to phrase the new exception too tightly. Given its philosophical origin, it should be phrased in general terms, so that in any particular case the court may consider whether it is just to impose liability on the successor corporation. The various factors identified in the several cases discussed above will always be pertinent— for example, whether the successor corporation advertised itself as an ongoing enterprise; ... or whether it maintained the same product, name, personnel, property, and clients; ... or whether it acquired the predecessor corporation's name and goodwill and required the predecessor to dissolve.... Also, it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp.*, supra, has been met. The exception will more likely realize its reason for being, however, if such details are not made part of its formulation. The formulation of the Court in *Ramirez v. Amsted Industries, Inc.*, supra, is well-put, and we adopt it. Citations omitted.

Taking this admonition "not to phrase the new exception too tightly" to heart, another district court has decided not to confine the product-line exception to situations wherein "one corporation acquires all or substantially all the manufacturing assets of another corporation". In the case of *Amader v. Pittsburgh Corning Corp.*, 546 F.Supp. 1033, 1036–37 (E.D.Pa. 1982), the situation was that the Defendant had purchased one complete facet of the predecessor's business, but the predecessor continued to exist under the same name. Despite the Defendant's assertion that failure to purchase all of the predecessor's assets, rather than just one product line, precluded a finding that it was susceptible to successor liability, the district court wrote:

> Given the fact that Pennsylvania has cautioned against a narrow construction of the product line and has emphasized that the social policies underlying strict liability gain expression through application of this doctrine, we believe that it applies where one corporation acquires a complete product line, including manufacturing and distribution outlets, and continues to manufacture the very same product.

In the instant case we have found that not only did Volvo-White acquire all of White's truck manufacturing capability, but also that Volvo-White required that such operations of White which continued to exist after its bankruptcy would be known by another name. Such a requirement was not imposed upon the transferor corporation in *Amader*. Thus, our case is an even better candidate for the imposition of successor liability.

In sum, the various findings of fact which we enumerated in part I of this Opinion, which were made after a thorough review of the testimony and documentation produced at trial, contain virtually all the indicia which the *Dawejko* Court considered germane to a finding that a successor corporation is liable for the torts of its predecessor. We must say that, though this issue was hotly contested and ardently briefed by the parties, our decision to grant judgment in favor of the Plaintiffs on the successor liability argument was not a difficult one to make. We believe that, in consideration of the facts adduced at trial and the state of the case law, any other decision would have been irrational.