Charles J. LaPOLLO, by his father and Guardian ad litem, Charles P. LaPOLLO, Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, Ponderosa, Inc., Hobart Manufacturing Company, John Does I–V, John Doe Corporations I–V, John Doe Joint Venture, and Roe Non-Profit Corporations I–II, Defendants.

Civ. A. No. 85–4824.

United States District Court, D. New Jersey.

July 15, 1987.

Philip L. Faccenda, Audubon, N.J., for plaintiffs.

Garrigle, Chierici, Palm & Wright by William A. Garrigle, Cherry Hill, N.J., for defendant Hobart Mfg. Co., Inc.

Montano, Summers, Mullen, Manuel & Owens by Mark R. Sander, Westmont, N.J., for defendant Ponderosa, Inc.

Parker, McCay and Criscuolo, P.A. by David A. Parker, Marlton, N.J., for defendant General Elec. Co.

## OPINION

COHEN, Senior District Judge:

Presently before the court in this diversity suit for personal injuries by plaintiff, Charles J. LaPollo, is a motion by defendant Hobart Manufacturing Company, Inc.

("Hobart") for summary judgment. For the following reasons, Hobart's motion shall be granted in part and denied in part.

On June 3, 1985, plaintiff, a restaurant employee at defendant Ponderosa, Inc. ("Ponderosa"), suffered burns and other injuries in the course of operating a deep fryer at work. It appears undisputed that the deep fryer, Model No. AK–40, was manufactured and distributed by defendant General Electric Co. ("GE")—more specifically, by GE's former Food Service Equipment Department.

In April, 1980, after the particular deep fryer involved in this case had been manufactured and distributed by GE, Hobart purchased the assets of GE's Food Service Equipment Department. Those portions of the Purchase Agreement between Hobart and GE that have been submitted to the court indicate that Hobart was permitted to use GE's trademarks and trade names only for a period of six months after the closing date, following which time such use was prohibited.[1] Under a Warranty Service Agreement between GE and Hobart, Hobart agreed to provide warranty service for products sold by GE and GE agreed to reimburse Hobart for its costs in doing so. The Purchase Agreement provided that GE would indemnify Hobart against any liabilities incurred through breach of any GE warranty, and also against any tort liabilities incurred with respect to products sold by GE.[2] After the sale, Hobart apparently continued to use the designation AK–40 for the type of deep fryer involved in this case until the production of these deep fryers ceased.

Plaintiff filed suit against Ponderosa, Hobart, GE, and various John Doe individuals and corporations. Plaintiff seeks to recover against Hobart on strict products-liability, breach of warranty, and negligence grounds, the latter encompassing, *inter alia*, the alleged failure to maintain, inspect, repair or service and the failure to

1. Hobart was also permitted to use GE's trademarks and trade names in connection with items included in inventory on the closing date.

2. GE expressly agreed to indemnify Hobart for "liabilities and obligations with respect to ...

products sold by GE or liabilities or obligations which are primarily those of GE but which are asserted against Hobart on the theory that Hobart is the successor to the [Food Service Equipment Department] of GE."

warn of the dangers associated with the deep fryer.

Hobart here moves for summary judgment, which motion is opposed by plaintiff and by Ponderosa. Hobart asserts, first, that it cannot be held liable, on strict products-liability grounds, as a successor corporation to GE, primarily because GE is still a viable entity and in fact is a party to this suit. Second, Hobart asserts that it cannot be held liable for negligence because it has not been established that Hobart serviced the particular deep fryer involved in this case. We shall discuss each of these arguments in turn.

### I. Strict Products-Liability Claim

Established principles of corporate law provide that when one company sells or transfers its assets to another company, the purchasing company does not become liable for the debts and liabilities of the selling company, including tort liabilities, unless (1) the purchasing company assumes liability; (2) the transaction amounts to a consolidation or merger of the two companies; (3) the transaction is entered into fraudulently in order to escape from liability; or (4) the purchasing company is a "mere continuation" of the selling company. See, e.g., Polius v. Clark Equipment Co., 802 F.2d 75, 77–78 (3d Cir.1986). Traditionally, the "mere continuation" exception has been applied when the purchasing company acquires the assets of the selling company in exchange for shares of stock, rather than for cash. See, e.g., Travis v. Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977). If the selling company dissolves after its assets are acquired by a successor, a plaintiff injured by a defective product manufactured by the selling company who cannot establish that one of these four exceptions applies is, in most states, left without a remedy.

The traditional corporate approach has been criticized "as being inconsistent with the rapidly developing principles of strict liability in tort and unresponsive to the legitimate interests of the products liability plaintiff," Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 341, 431 A.2d 811, 815 (1981). In response to these concerns, a minority of courts have imposed liability on successor corporations for the torts of their predecessors in circumstances not encompassed by the traditional exceptions to corporate successor nonliability.

For instance, in Turner v. Bituminous Casualty Co., 397 Mich. 406, 244 N.W.2d 873 (1976), the Michigan Supreme Court rejected the traditional distinction between an acquisition for cash and an acquisition for shares of stock, stating that "[i]t would make better sense if the law had a common result and allowed products liability recovery in each case." Id. at 423, 244 N.W.2d at 880. In what has been described as an expansion of the mere continuation exception, e.g. Ramirez, 86 N.J. at 345, 431 A.2d at 817, the Turner court held that the "continuity of enterprise" rather than the continuity of shareholders was the better standard. Such factors as the retention of personnel, assets, business operations, trade name, and management are relevant in determining whether there is continuity of enterprise. 397 Mich. at 429–30, N.W.2d at 883–84.

A second approach, known as the "product line" exception to successor nonliability, was developed by the California Supreme Court in Ray v. Alad, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), and has since been adopted by a panel of the Pennsylvania Superior Court and, more significantly for present purposes, by the New Jersey Supreme Court. See Dawejko v. Jorgensen Steel Co., 290 Pa.Super. 15, 434 A.2d 106 (1981);[3] Ramirez, supra. In contrast to the expanded mere continuation exception, the product line test "is concerned not with the continuation of the corporate entity as such but rather with the successor's undertaking to manufacture essentially the same line of products as the predecessor." Ramirez, 86 N.J. at

---

3. A number of courts have predicted that the Pennsylvania Supreme Court, which has yet to address the issue, would affirm the Superior Court's decision in Dawjeko. See Conway v. White Trucks, A Div. of White Motor Corp., 639 F.Supp. 160, 163 n. 3 (M.D.Pa.1986); Amader v. Pittsburgh Corning Corp., 546 F.Supp. 1033, 1036 (E.D.Pa.1982).

347, 431 A.2d at 819. In selecting the product line approach, the New Jersey Supreme Court reasoned that the social policies underlying strict products liability were best served by extending liability to a successor when it acquires the predecessor's business assets, continues its product line, and enjoys various concomitant benefits such as the name, good will and business reputation of the predecessor. *Id.* at 358, 431 A.2d at 825.

In *Ramirez,* as in *Ray* and *Dawejko,* the successor corporation was the only viable corporation that plaintiff could sue; remedies against the original manufacturer had been destroyed by the successor's acquisition of its business assets. In the instant case, the predecessor corporation, GE, remains a viable entity and is a party to this suit. Therefore, the issue we face is whether a successor corporation is liable, under New Jersey's product line exception, when the predecessor corporation sells one or more of its product lines to the successor, but continues to manufacture and distribute other product lines and, accordingly, retains assets from which a products-liability plaintiff may recover.

The Supreme Court of New Jersey has yet to directly address the issue before us. Consequently, we must predict how that court would rule, considering relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data. *McGowan v. University of Scranton,* 759 F.2d 287, 291 (3d Cir.1985) (citations omitted); *McNeilab, Inc. v. North River Ins. Co.,* 645 F.Supp. 525, 532 n. 9 (D.N.J.1986) (citations omitted). In addition, "a federal court must determine the rule that the state Supreme Court would probably follow, not fashion a rule which an independent federal court might consider best." *Meadow Ltd. Partnership v. Heritage Sav. & Loan,* 639 F.Supp. 643, 653 (E.D.Va.1986).

The logical starting point is the *Ramirez* decision itself. In *Ramirez,* the New Jersey Supreme Court "adopt[ed] substantially" the product line approach developed by the California Supreme Court in *Ray,* which it cited as holding that "a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired." 86 N.J. at 349, 431 A.2d at 820 (citing *Ray,* 19 Cal.3d at 34, 136 Cal.Rptr. at 582, 560 P.2d at 11). Although this formulation of the product line exception makes no direct mention of the significance of a plaintiff's inability to recover from the predecessor company, the *Ramirez* court went on to approve the *Ray* court's three-fold justification for the product line exception:

(1) *The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,* (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

86 N.J. at 349, 431 A.2d at 820 (citing *Ray,* 19 Cal.3d at 31, 136 Cal.Rptr. at 580, 560 P.2d at 9) (emphasis added). And the *Ramirez* court phrased its holding as follows:

where one corporation *acquires all or substantially all the manufacturing assets of another corporation,* even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation.

86 N.J. at 358, 431 A.2d at 825 (emphasis added).

It is true that other portions of the *Ramirez* case can be read as deemphasizing the significance of the destruction of plaintiff's remedy against the original manufacturer. For instance, in applying *Ray* 's three-fold justification to the facts before

it, the *Ramirez* court noted that plaintiff's remedies against the predecessor had been extinguished but then stated that "what is most important ... is that there was continuity in the manufacturing" of the product line. 86 N.J. at 350, 431 A.2d at 820. And, as discussed more fully *infra*, the court's partial reliance on a theory of enterprise liability in justifying its holding, 86 N.J. at 351, 431 A.2d at 821, likewise could be viewed as inconsistent with a requirement that plaintiff's remedies against the original manufacturer be destroyed. Nevertheless, we think that the *Ramirez* court's repeated references to plaintiff's inability to recover from the original manufacturer and its carefully phrased holding, coupled with the absence of any explicit disapprobation of the relevance of *Ray*'s first justification, counsel against imposing liability in the situation before us. We note also that Justice Schreiber's concurrence supports this view. *See Ramirez*, 86 N.J. at 358, 431 A.2d at 825 (Schreiber, J., concurring) ("The central thesis of the [product line exception] is premised on the elimination by the successor of an effective remedy. That is an essential condition precedent to recovery.") *See also Brotherton v. Celotex Corp.*, 202 N.J.Super. 148, 158–59, 493 A.2d 1337, 1342 (1985) ("The product line theory is designed to liberalize recovery for plaintiffs left remediless against a defunct corporation"); *Schweitzer v. Consolidated Rail Corp.*, 65 B.R. 794, 804–05 (E.D.Pa. 1986) (implicit in *Ramirez* is requirement that remedy against predecessor be unavailable.)

*Nieves v. Bruno Sherman Corp.*, 86 N.J. 361, 431 A.2d 826 (1981), *Ramirez*'s companion case, provides further guidance. In *Nieves*, the New Jersey Supreme Court held that an intermediate successor corporation—"one that acquired all the business assets from the original manufacturer and thereafter transferred those assets to *its* successor and discontinued the offending product line", *id.* at 364, 431 A.2d at 828— could be held liable under the product line theory along with the current successor. At first blush, *Nieves* might appear to sanction recovery against a successor notwithstanding the continued viability of the original manufacturer; as one writer points out, liability was imposed on the current successor in *Nieves* notwithstanding the fact that *its* predecessor—the intermediate successor—was a viable entity. *See* Note, *Corporations—Intermediate and Successor Corporations Strictly Liable Under Product Line Standard*, 12 Seton Hall L.Rev. 327, 344–45 (1982). Further examination of *Nieves* quickly dispels any force in this analysis. Relying on *Ray*'s first justification—"the virtual destruction of the plaintiff's remedies against the *original manufacturer* caused by the successor's acquisition of the business" (emphasis added)—the *Nieves* court held that recovery against both the intermediate and the current successor was justifiable because each had contributed to the "unavailability of the original manufacturer." 86 N.J. at 371, 431 A.2d at 831. In our view, there is nothing in *Nieves* to suggest that when the *original manufacturer* remains viable, recovery against the successor is nonetheless available; instead, the court's rationale that each successor "caused" the dissolution of the original manufacturer augurs to the contrary.

Hobart correctly notes that a number of courts in other jurisdictions have declined to impose liability on a successor corporation for the torts of its predecessor when the predecessor is still extant. *See Hall v. Armstrong*, 103 Wash.2d 258, 267, 692 P.2d 787, 793 (1984) ("we can discern no valid reason for extending the product line exception when the predecessor has not been extinguished, in law or in fact, by succession or dissolution"); *Stratton v. Garvey International, Inc.*, 9 Kan.App.2d 254, 264, 676 P.2d 1290, 1297 (1984) ("The product line theory is inapplicable in the instant case ... because plaintiff's remedy against the original installer of the [product] ... has not been destroyed"). However, the propriety of this position is not universally acknowledged. Particularly, federal courts attempting to predict the approach that Pennsylvania courts would take on this matter have not reached uniform conclusions. *Compare Amader v. Pittsburgh Corning Corp.*, 546 F.Supp.

1033, 1036 (E.D.Pa.1982) (permitting recovery against successor notwithstanding continued viability of predecessor; to do otherwise would "unfairly straightjacket" the rule); *Conway v. White Trucks, A Division of White Motor Corp.*, 639 F.Supp. 160, 164 (M.D.Pa.1986) (permitting recovery); *Gibson v. Armstrong World Industries, Inc.*, 648 F.Supp. 1538, 1541–42 (D.Col.1986) (permitting recovery) *with Long John Silvers v. Arch Engineering*, 520 F.Supp. 753, 759 (W.D.Pa.1981) ("Policy considerations suggest to us that as between two on-going businesses of the type involved here, who as far as the record is concerned are equally capable of responding to a claim, the risk of loss should fall on the party who marketed the product"); *Shorb by Shorb v. Airco, Inc.*, 644 F.Supp. 923, 928–29 (E.D.Pa.1986) (denying recovery); *Reed v. Armstrong Cork Co.*, 577 F.Supp. 246, 251 (E.D.Ark.1983) (denying recovery).

The differing results reached by the federal courts that have attempted to predict the future course of Pennsylvania law are perhaps attributable to the fact that in *Dawjeko*, the Pennsylvania Superior Court explicitly stated that the presence of each prong of *Ray*'s three-fold justification for the product line exception was not a pre-requisite to recovery in every case. The court stated that it was "better not to phrase the new exception too tightly ... it will always be useful to consider whether the three-part test stated in *Ray v. Alad Corp.* ... has been met. The exception will more likely realize its reason for being, however, if such details are not made part of its formulation." 290 Pa.Super. at 26, 434 A.2d at 111. There was no similar pronouncement by the New Jersey Supreme Court in *Ramirez*.[4]

Commentators disagree as to whether liability ought to be imposed on a successor corporation notwithstanding the continuing viability of its predecessor.[5] Those advocating the imposition of liability reason, *inter alia*, that under established principles of enterprise liability, the successor should be held liable as part of the enterprise responsible for the defective product, just as distributors and retailers are held liable for a defectively manufactured product. These writers further assert that the successor, not the plaintiff, should bear the burden of insuring that the original manufacturer is ultimately held responsible by seeking indemnification, and that a contrary approach could bar recovery in cases where the predecessor, while remaining viable, retains only minimal assets after the

---

**4.** Likewise, the *Ray* court did not explicitly state that the product line exception pertains even if one of its justifications is absent in a particular case. Perhaps as a consequence, federal courts interpreting California law have required that a plaintiff's remedies against the predecessor corporation have been destroyed as a result of the successor's acquisition in order for successor liability to attach. *See In re Related Asbestos Cases*, 578 F.Supp. 91, 92 (N.D.Cal.1983), *aff'd sub nom, Kline v. Johns-Manville*, 745 F.2d 1217, 1220 (9th Cir.1984). *See also Kaminski v. Western MacArthur Co.*, 175 Cal.App.3d 445, 458, 220 Cal.Rptr. 895, 902–03 (1985). *But see Rawlings v. D.M. Oliver, Inc.*, 97 Cal.App.3d 890, 900, 159 Cal.Rptr. 119, 124 (1979), in which the court stated,

> [*Ray v.*] *Alad* should not be construed so narrowly as to create an exclusive exception to the general rule for successor liability permitting a similar result only in an *Alad* clone. It is essential to focus on the policy considerations underlying strict products liability rather than merely courting the factors mentioned in *Alad* and giving each equal weight.

However, immediately preceding this statement is the court's observation that "the same barriers to plaintiff's recovery and the virtual destruction of her remedy against the predecessor manufacturer as expressed in *Alad* ... may be present in the case at bench." *Id.* at 900, 159 Cal.Rptr. at 124.

**5.** *Compare, e.g.,* Philips, *Product Line Continuity and Successor Corporation Liability*, 58 N.Y.U.L. Rev. 906, 914–17 (1983) *and* Note, *The Product Line Theory of Corporate Successor Products Liability. An Evaluation After Ramirez v. Armsted Industries*, 35 Rut.L.Rev. 389, 414–16 (1983) (successor should be held liable even when predecessor is extant) *with* Schulman, Commentary: *Successor Corporation Liability and the Inadequacy of the Product Line Continuity Approach*, 31 Wayne L.Rev. 135, 144–45 (1984) *and* Kadens, *Practitioner's Guide to Treatment of Sellers' Products Liabilities in Assets Requisitions*, 10 U.Tol.L.Rev. 1, 17–18 (1978) (successor corporation should not be held liable when predecessor is extant).

transfer to the successor. *E.g.*, Note, *supra* note 5, at 415–16. Commentators opposing the imposition of liability on a successor when its predecessor remains viable respond that the fact that enterprise liability is a well established doctrine does not justify its arbitrary extension into the successor liability context, and that acceptance of the enterprise liability approach furnishes a plaintiff with "windfall defendants." They further maintain that if "the plaintiff's remedy appears illusory despite seller's continued existence, the courts should explore why and make their decision after a proper balancing of all interests." Kadens, *supra* note 5, at 18.

It is true that in *Ramirez*, the New Jersey Supreme Court grounded its holding in part on its observation that "strict liability for injuries caused by defective products placed into the stream of commerce is 'an enterprise liability' (citation omitted), one that continues so long as the defective product is on the market." 86 N.J. at 351, 431 A.2d at 821. We would be less than candid were we to deny that this aspect of *Ramirez* causes us pause; the court's reliance on "downstream corporate liability cases in the products liability context", *id.*, 431 A.2d at 821, could be read to signify a willingness to permit recovery against the successor notwithstanding the continued viability of the predecessor on the ground that a successor, like a distributor or a retailer, is part of the enterprise responsible for the defective product. We note, however, that the court's reliance on the theory of enterprise liability appears, not in the context of its discussion of *Ray*'s *first* justification, but instead of *Ray*'s *second* justification—"the successor's ability to assume the original manufacturer's risk-

spreading role." The *Ramirez* court compared a successor corporation to downstream corporate entities in standard strict liability cases in its ability to spread the cost of injuries to society at large. It does not automatically follow that if the original manufacturer remains extant, the successor should be held liable nonetheless.[6]

More importantly, to impose liability on a successor corporation notwithstanding the continued viability of its predecessor would not simply be to heed the Pennsylvania Superior Court's recommendation that the product line rule not be phrased "too tightly", *Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111, but would in effect entirely nullify *Ray*'s first justification for the rule. Obviously, "the virtual destruction of plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business" would no longer be relevant. In view of the fact that the product line exception was developed in response to the very concern that we contemplate discounting, *see Ramirez*, 86 N.J. at 341, 431 A.2d at 815, we are loathe to hold that the New Jersey Supreme Court, which has never repudiated *Ray*'s first justification, would impose liability under the circumstances here presented. We stress that this is not a case in which the ability of the predecessor corporation (GE) to satisfy any judgment against it is in doubt, and that our prediction that the New Jersey Supreme Court would not impose liability on the successor corporation in *this* case neither encompasses such a situation nor necessitates its similar resolution. We hold, therefore, that were the New Jersey Supreme Court to address the issue, it would decline to impose liability on Hobart in light of GE's continued viability.

---

**6.** We note also that GE and Hobart expressly agreed that GE would indemnify Hobart for liabilities of GE which were asserted against Hobart on the theory that Hobart was GE's successor. *See supra* note 2. One court has stated that in such a situation, "the question is not the remedies available to a tort victim, but the rights and duties *inter se* of two corporations," and that

it would be an act of superarrogation for the judiciary, in the guise of applying the product line exception, to rewrite [the parties'] contract [so as to impose liability on the successor]. Such a result is not contemplated, let alone mandated, by any of the cases on the product line exception, the purpose of which is to compensate otherwise remediless tort victims, not to preempt the role of contract in corporate successorships.

*Shorb*, 644 F.Supp. at 928–29.

Alternatively, even assuming *arguendo* that the New Jersey Supreme Court would *not* bar recovery against a successor on the ground that its predecessor remains viable, we believe that it would nevertheless decline to impose liability in the present case. Not only is the first justification of *Ray* absent, but the third justification—"the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor"—may be absent as well. The Purchase Agreement between GE and Hobart prohibited Hobart from using GE's trademarks and trade names more than six months after the closing date; accordingly, Hobart may not have enjoyed the full extent of good will envisioned by *Ray* and *Ramirez.*[7] It does appear that Hobart acquired the established manufacturing enterprise of GE's Food Service Equipment Department—its plant, employees, and manufacturing equipment—and the *Ramirez* court viewed such factors, in addition to the retention of a trade name, as significant in establishing the presence of the third justification. Nevertheless, we think that Hobart's inability to use GE's trademarks and trade names, coupled with the fact that GE remains extant, mandates the conclusion that the product line exception is inapplicable in this case; it would be anamolous to apply the exception when so much of its underlying justification is absent.

Accordingly, Hobart's summary judgment motion shall be granted with respect to plaintiff's strict products-liability claim.

## II. Negligence Claim

Hobart also seeks summary judgment on plaintiff's negligence claims. As mentioned above, plaintiff seeks recovery for Hobart's alleged negligent failure to maintain, inspect, repair or service the deep fryer, as well as Hobart's alleged negligent failure to warn of dangers associated with the fryer.

Hobart asserts that summary judgment in its favor is required because there has been no showing that Hobart serviced the deep fryer involved in this case. However, because such a circumstance is not dispositive of the issue of Hobart's duty to warn, and because we think that there exist genuine issues of material fact with respect to such a duty, Hobart's motion must be denied.

In *Nieves, supra,* the New Jersey Supreme Court stated:

> Succession to a predecessor's service contract, coverage of the particular machine under a service contract, service of the machine by the purchaser corporation, a purchaser corporation's knowledge of defects and of the location or owner of that machine, are factors which may be considered in determining the presence of a nexus or relationship effective to create a duty to warn.

86 N.J. at 373, 431 A.2d at 833 (quoting *Travis v. Harris Corp.,* 565 F.2d 443, 449 (7th Cir.1977)).

Under *Nieves,* then, service of the machine by the purchaser corporation is but one of a number of factors that must be taken into account in determining whether a duty to warn exists. Therefore, assuming that plaintiff is able to establish that the design of the deep fryer involved in this case was sufficiently hazardous to warrant some sort of warning, the record reveals that genuine issues of material fact exist as to whether Hobart was under any obligation to so warn; for instance, whether it knew or should have known of the hazard-

---

7. Although Hobart continued to use the designation AK–40 for the deep fryer, the record is devoid of any evidence suggesting that the general public attached the sort of significance to this designation that it would to a trademark or trade name, and we accordingly do not think that the continued use of the AK–40 designation is apposite.

ous condition and whether it knew that Ponderosa owned such a deep fryer.

We accordingly must deny Hobart's summary judgment motion on plaintiff's negligence claim. An appropriate order will be entered.