

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-16-1994

# Leo v. Kerr-McGee Chem. Corp.

Precedential or Non-Precedential:

Docket 93-5730

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Leo v. Kerr-McGee Chem. Corp." (1994). *1994 Decisions.* Paper 134.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/134

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-5730


ELAINE LEO, Administratrix of the Estate of
CATHERINE M. BEKES, deceased, Administratrix Ad
Prosequendum on behalf of the Estate of THOMAS BEKES,
deceased, and individually; LINDA YODER, individually

v.

KERR-MCGEE CHEMICAL CORPORATION, a Delaware Corporation,
successor in interest to Welsbach Company and/or Welsbach
Incandescent Gas Light Co., Lindsay Chemical Co.,
American Potash and Chemical Corp. and American Potash,
an Illinois Corporation; U.G.I., f/k/a United Gas
Improvement Company, a Pennsylvania Corporation;
JOHN DOES 1-20; ROBERT ROES 1-20; JAMES JOES 1-20;
XYZ CORPORATION 1-20; RHEEM RUDD, a corporation
successor interest to City Investing Co., Rudd
Waterheater Division and Rudd Manufacturing Company

Kerr-McGee Chemical Corporation,

Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 93-01107)


Argued August 1, 1994

BEFORE:   GREENBERG and STAPLETON, Circuit Judges,
          and ATKINS, District Judge*

(Filed: September 19, 1994)


                         Thomas J. Hagner (argued)
                         Freeman, Mintz, Hagner &
                         Deiches
                         34 Tanner Street
                         Haddonfield, NJ 08033-2482

                                        Attorneys for Appellee


* Honorable C. Clyde Atkins, Senior United States District Judge
for the Southern District of Florida, sitting by designation.
                                        Peter J. Nickles (argued)
                                        Coleman S. Hicks
                                        Richard A. Meserve
                                        Elliott Schulder
                                        Caroline M. Brown
                                        Covington & Burling
                                        1201 Pennsylvania Ave., NW
                                        P.O. Box 7566
                                        Washington, DC 20044-7566

                                        Attorneys for Appellant

OPINION OF THE COURT


GREENBERG, Circuit Judge.

I.  FACTUAL AND PROCEDURAL HISTORY

This matter is before the court following entry of our order on November 30, 1993, granting defendant-appellant Kerr-McGee Chemical Corporation permission to appeal pursuant to 28 U.S.C. § 1292(b).  We will reverse the order of the district court denying Kerr-McGee's motion for summary judgment entered on September 8, 1993, and we will remand the matter to the district court for entry of a summary judgment in its favor.

The facts are largely not in dispute, and, in any event, we accept the allegations of the plaintiffs-appellees Elaine Leo and Linda Yoder for purposes of this appeal.  From prior to the turn of the 20th century continuing until 1940, the Welsbach Incandescent Light Company maintained and operated a factory in Gloucester City, New Jersey, for manufacturing

incandescent gas mantles, a process involving extracting thorium from monazite ores. This process generated toxic wastes consisting of thorium by-products which Welsbach deposited on the factory site, thus contaminating the surrounding land. In 1940, Welsbach's Illinois-based competitor, Lindsay Light and Chemical Company, purchased Welsbach's gas mantle business. In the sale, Lindsay acquired Welsbach's outstanding orders, records, formulas, raw materials, inventory, customer lists, gas mantle production line, and the right to use the "Welsbach" name. However, Lindsay did not acquire the Gloucester City land and factory. Rather, it moved the gas mantle business to its own plant in Illinois.

Following a series of acquisitions, Kerr-McGee acquired Lindsay, and it thus concedes that in this litigation it stands in Lindsay's shoes. Accordingly, we will refer to Lindsay and Kerr-McGee simply as Kerr-McGee. Welsbach owned a second line of business which it sold to Rheem Manufacturing Company but Rheem's successors, though originally defendants in this action, have been dismissed from the case. Welsbach was dissolved in 1944.

In 1961, Leo and Yoder, who are sisters, and their parents, Thomas and Catherine Bekes, moved to a home close to the former site of the Welsbach factory in Gloucester City, though Leo and Yoder now live elsewhere. On December 5, 1988, Thomas Bekes died from bladder cancer. In March 1991, the New Jersey Department of Environmental Protection notified Catherine Bekes of the high levels of gamma radiation and thorium on her property and on June 3, 1991, the New Jersey Spill Compensation Fund

acquired her residence, forcing her to relocate.  Soon thereafter she also died from bladder cancer.  Leo and Yoder allege that their parents contracted their bladder cancer from exposure to thorium and other waste substances deposited on the Welsbach land.

On January 29, 1993, Leo and Yoder filed suit, individually, and on behalf of their parents' estates, in the Superior Court of New Jersey against Kerr-McGee and certain other defendants to recover for death, injuries, and the potential risk of cancer arising from their exposure to thorium and other waste substances generated in the Welsbach gas mantle operation and deposited on the Gloucester City property.  As germane here, Leo and Yoder seek to impose liability on Kerr-McGee on a theory of strict liability.[1]  While Leo and Yoder do not claim that Kerr-McGee itself generated the waste which caused the deaths and injuries, they assert that it is liable by reason of its acquisition of Welsbach's gas mantle business.  On March 4, 1993, one of the other defendants removed the case to the United States District Court for the District of New Jersey on the basis of diversity of citizenship.

Subsequently, Kerr-McGee filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) on the ground that the complaint did not state a claim on which relief may be granted inasmuch as

---

[1].  Leo and Yoder also set forth theories of liability predicated on negligence and breach of warranty but we do not discuss them as we find no support for liability on either theory and they do not advance these theories on a basis distinct from the strict liability claim.

Kerr-McGee never has owned the Gloucester City land and factory. In its bench opinion the district court treated the motion as a motion for summary judgment because it considered material other than the complaint submitted on the motion. The court then predicted that the New Jersey Supreme Court would extend the product line doctrine of successor corporate liability, as explicated in Ramirez v. Amsted Indus., Inc., 431 A.2d 811 (N.J. 1981), to the toxic tort at issue, because the toxic by-products were generated directly from the manufacturing of Welsbach's gas mantles.[2] Thus, the court denied Kerr-McGee's motion by the order of September 8, 1993. Kerr-McGee then moved for an amendment of the order to allow an interlocutory appeal, and the district court granted the amendment by an order entered on November 1, 1993. We then granted Kerr-McGee leave to appeal.

## II. DISCUSSION

We exercise plenary review as the appeal presents an issue of law. Epstein Family Partnership v. Kmart Corp., 13 F.3d

_____

[2]. The court also relied on Nieves v. Bruno Sherman Corp., 431 A.2d 826 (N.J. 1981), decided on the same day as Ramirez. We, however, have no need to discuss Nieves at length as it merely held that an intermediate successor corporation could be liable under Ramirez even though there is a later viable successor corporation in existence. We note that actions similar to the one in this case are sometimes called "environmental torts" and sometimes called "toxic torts." As a matter of convenience, we use the latter term as the Supreme Court of New Jersey used that term in T & E Indus., Inc. v. Safety Light Corp., 587 A.2d 1249, 1251 (N.J. 1991). Labels, however, are not significant, as we are concerned with the circumstances leading to the attempt to impose liability on Kerr-McGee rather than the characterization of the claim.

762, 765-66 (3d Cir. 1994). Furthermore, we will apply New

Jersey law as the parties agree that it is applicable. Thus, we

undertake to predict how the Supreme Court of New Jersey would

resolve the issues in this case. J & R Ice Cream Corp. v.

California Smoothie Licensing Corp., No. 93-5516, slip op. at 19-

21 (3d Cir. Aug. 4, 1994).

We start, of course, with Ramirez, 431 A.2d 811, in

which the Supreme Court of New Jersey held that:
> where one corporation acquires all or
> substantially all the manufacturing assets of
> another corporation, even if exclusively for
> cash, and undertakes essentially the same
> manufacturing operation as the selling
> corporation, the purchasing corporation is
> strictly liable for the injuries caused by
> defects in the units of the same product
> line, even if previously manufactured and
> distributed by the selling corporation or its
> predecessor.

431 A.2d at 825. As the district court acknowledged, Ramirez is

distinguishable from this case. Unlike the injuries in Ramirez,

the injuries of Leo, Yoder, and their parents were not caused by

a unit in the product line manufactured first by Welsbach and

then by Kerr-McGee. Instead the injuries in this case were

caused by conditions created by Welsbach's operations on land

which Welsbach retained at the time of the sale of the gas mantle

business to Kerr-McGee and on which Kerr-McGee never conducted

any manufacturing activities. Therefore, we must determine

whether in light of these distinctions from Ramirez, the New

Jersey Supreme Court nevertheless would apply the result in Ramirez to this case.[3]

The Ramirez court predicated its conclusion that the successor corporation could be liable for injuries caused by its predecessor's defective product on three rationales: (1) the sale of the enterprise virtually destroyed the injured party's remedy against the original manufacturer; (2) the successor has the ability to assume the original manufacturer's risk-spreading role; and (3) it is fair to require the successor to assume a responsibility for defective products as that responsibility was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business. Id. at 820. Clearly these rationales do not support the extension of successor liability to Kerr McGee in this case.

The first factor, the destruction of the injured party's remedy is a necessary but not a sufficient basis on which to place liability on the successor.[4] Accordingly, if the

_____

[3]. A corporate successor can be liable for its predecessor's debts on theories other than that recognized in Ramirez. For example, liability can be imposed on the successor if it assumes the predecessor's liabilities or if the predecessor merges into the successor. Ramirez, 431 A.2d at 815. But we confine our opinion to the question of whether Kerr-McGee may be liable based on the product-line doctrine of successor liability as that is the only basis for liability that Leo and Yoder advance against Kerr-McGee.

[4]. Actually, we are not certain that Leo and Yoder effectively do not have a remedy against Welsbach as they have named U.G.I., formerly known as United Gas Improvement Company, as a defendant on a theory that United Gas dominated Welsbach and therefore U.G.I. is "legally responsible for the obligations of Welsbach."

selling corporation remains a viable entity able to respond in damages to the injured party, a successor acquiring a product line will not be liable for injuries caused by the predecessor's product after the product's sale as in that circumstance there would be no reason to impose successor liability. Lapollo v. General Elec. Co., 664 F. Supp. 178 (D.N.J. 1987) (applying New Jersey law after Ramirez). This initial rationale for the product-line doctrine of successor liability merely focuses on the need for imposition of successor liability rather than whether it is fair to impose it. Therefore, we will not hold that proof that Leo and Yoder cannot recover against Welsbach because it has been dissolved is in itself a sufficient basis for the imposition of successor liability on Kerr-McGee.

The second rationale on which the Supreme Court of New Jersey based its result in Ramirez was the successor's ability to assume the predecessor corporation's risk-spreading role. We think that the Supreme Court of New Jersey would recognize that Kerr-McGee does not have the capacity to assume Welsbach's risk-spreading role. In this regard, we point out that if successor liability can be imposed for a toxic tort arising from the predecessor's operations at a facility which the successor never acquires or controls, a prudent manufacturer acquiring a product line would make an analysis of environmental risks associated with the seller's facilities similar to that now undertaken by

(..continued)
However, Kerr-McGee has briefed the case on the assumption that Leo and Yoder do not have a remedy against Welsbach, and thus we decide the case on that basis.

purchasers of real estate.  The purchaser then would attempt to acquire insurance for possible liabilities associated with the seller's real estate.

The impediment to commercial transactions from such a process is evident.  Indeed, inasmuch as a manufacturer might build a product or its component parts at more than one facility, a purchaser of a product line might face daunting obstacles in attempting to assess its risks of successor toxic tort liability for conditions on property to be retained by the seller of the product line.  Furthermore, a product-line purchaser not acquiring its predecessor's manufacturing facility probably would not be able to lessen the risks of toxic tort liability associated with the real estate.  It is doubtful that such a product-line purchaser would be able to undertake cleanup operations on land it did not own.  Moreover, the product-line purchaser might be unwilling to undertake such potentially costly projects.[5]  It seems clear, therefore, that if Ramirez applies here, a purchaser of a product line will be subject to liabilities for toxic torts of unpredictable scope for an indefinite period.  Overall, we cannot conceive that the Supreme Court of New Jersey would believe that the purchaser of a product line not acquiring the real estate at which the product was

---

[5].  In FMC Corp v. United States Dep't of Commerce, No. 92-1945, slip op. at 11 (3d Cir. July 5, 1994) (in banc), the government estimated the cost of environmental cleanup of the facility involved in that litigation at between $26,000,000 and $78,000,000.

manufactured reasonably could assume its predecessor's risk spreading role for toxic torts.[6]

In contrast, a successor to a product line may be able to take steps to reduce its risk of liability for injuries caused by the predecessor's products through recall and educational programs which include those products. Furthermore, successor liability for injuries caused by units manufactured by the predecessor, at least when compared to potential toxic tort liability, is a discrete manageable matter. First, the successor may be able reasonably to anticipate the risks associated with a product it is acquiring. Second, product-line successor liability is applied in cases of the production of personal property. Inasmuch as such property is not likely to have an indefinite useful life, passage of time will diminish the chance of liability being imposed on the successor.

This constant diminution of exposure to product liability is enhanced by the rule followed in New Jersey and elsewhere that a manufacturer cannot be strictly liable unless there was a defect in the product when it left the manufacturer's control. Scanlon v. General Motors Corp., 326 A.2d 673, 677 (N.J. 1974). It seems apparent that, except perhaps in design defect cases, a defect in a product when the manufacturer distributed the product is likely to manifest itself and cause

_____

[6]. In Ramirez the Supreme Court of New Jersey acknowledged that the negative effect of successor liability in a product liability case on the sale of manufacturing assets was a "legitimate" concern. 431 A.2d at 822. Thus, we think it appropriate for us to consider that effect.

injury within a reasonable time after the product is manufactured.  Accordingly, as a practical matter, successor liability under Ramirez is likely to be imposed in most cases, if at all, for a limited period.[7]  Furthermore, if there is an injury from a product a long time after it leaves the manufacturer's hands, the injured plaintiff may have difficulty establishing that the defect existed in the product when manufactured and originally distributed.  Thus, using the time scenario here, it would be unusual for the successor in a product line case to be defending an action in the 1990's for a product that could have been built at the latest in 1940.

On the other hand toxic tort liability can be imposed for activities in the distant past.  See T & E Indus., Inc. v. Safety Light Corp., 587 A.2d 1249 (N.J. 1991).[8]  This tail on potential toxic tort liability following the disposal of chemical wastes is attributable to the fact that the toxic wastes may remain in the ground for long periods, thus exposing persons and property to injury long after manufacturing has ended.  Indeed, this case demonstrates how long the successor can face claims for toxic torts.  Furthermore, the difficulty that the purchaser of a product line will have in assessing its risk of liability for

---

[7].  Of course, the length of the period depends on the type of product involved.  For example, machinery might last longer than automobiles.

[8].  We recognize that T & E Indus. is not a personal injury case. Nevertheless we cite the case to demonstrate how it is possible that the consequences of chemical disposal may endure for a very long period.

toxic torts as compared to its risk of successor product liability is further heightened by the fact that whereas injuries from defective products are likely to be traumatic, and thus be immediately obvious, injury from exposure to toxic wastes may develop over an extended period.  We also observe that it would be more likely that the successor could acquire insurance coverage for the discrete risks flowing from injuries caused directly by a predecessor's product than for environmental risks from conditions on real estate.

The third Ramirez rationale, that it is fair to require a successor to assume a responsibility for defective products as that responsibility is a burden necessarily attached to the successor's acquisition of the predecessor's good will, has no application in this case.  The good will that Kerr-McGee acquired from Welsbach was attached to the product line it acquired, gas mantles, rather than to the site at which Welsbach manufactured the product.  Thus, Leo and Yoder do not assert that this is a case in which Welsbach and Kerr-McGee encouraged the purchasers of the gas mantles to associate them with their geographical source, as, e.g., "a genuine widget manufactured in the widget center of the world."  Consequently, while Leo and Yoder point out that Kerr-McGee's purchase of the Welsbach gas mantle product line was profitable, and they attribute that profit in part to the good will it acquired from Welsbach, that point is immaterial.

In reaching our result, we quite naturally consider our opinion in City of Philadelphia v. Lead Indus. Ass'n, Inc., 994 F.2d 112 (3d Cir. 1993). There we indicated that while:

> [a] federal court may act as a judicial pioneer when interpreting the United States Constitution and federal law . . . [i]n a diversity case . . . federal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law . . . . Our role is to apply the current law of the jurisdiction, and leave it undisturbed.

Id. at 123 (internal citations and quotations omitted). We could allow liability to be imposed in this case on Kerr-McGee only if we stretched Ramirez far beyond its original scope and, in light of City of Philadelphia v. Lead Indus. Ass'n, Inc., we will not do that. While the district court believed that this case could come within the Ramirez holding, in large part it reached that conclusion because of what it thought was "the traditional New Jersey view that if you are injured somebody ought to be liable for it." But we reject that approach. While we might be willing to apply the precedents of the New Jersey Supreme Court in circumstances somewhat beyond the limits of liability that court has recognized in extant cases, we will not apply Ramirez in the circumstances here, which are far beyond the limits of that case.

In closing, we note that the parties in their briefs discuss cases involving liability of successors acquiring contaminated property and other cases involving liabilities arising from the ownership of and activities on real estate. See, e.g., T & E Indus., Inc. v. Safety Light Corp., 587 A.2d

1249; State of New Jersey, Dep't of Envtl. Protection v. Ventron Corp., 468 A.2d 150 (N.J. 1983). We have examined these cases but do not discuss them, as they have only the most tangential relationship to this case in light of the fact that Kerr-McGee never owned, controlled or engaged in activities on the Gloucester City property.

## III.   CONCLUSION

We will reverse the order of September 8, 1993, and will remand the matter to the district court for entry of a summary judgment in favor of Kerr-McGee.

ATKINS, Senior District Judge, specially concurring:

While the record does not reflect the fact, this judge takes judicial notice of the procedure, adopted by 44 of the Supreme Courts or comparable final state appellate courts, permitting federal appellate courts to submit questions for resolution by such courts, involving state common law issues that remain "open." Such procedure cries out for decision in the appeal sub judice. The issue concerns, as the majority opinion so clearly demonstrates, whether this court should hold an entity liable for environmental degradation of land for commercial engrandizement after it obviously profited from such degradation, even though acquisition of land was not part of the product line purchase. This salutary certification procedure avoids the charge, admittedly valid, that the federal courts should avoid extending, gratuitously, the common law of the states within the ambit of their jurisdiction. City of Philadelphia v. Lead Industries Ass'n, 994 F.2d 112 (3d Cir. 1993).

Here, we are called upon to decide what, under a new set of facts, the Supreme Court of New Jersey would decide in an issue it has never been called upon to consider. Our problem is complicated by New Jersey's failure to provide a certification procedure permitting it to have a needed and proper voice in the development of the common law of its state.

A.    The Development of New Jersey's "Product Line"
Doctrine

When the district court denied the plaintiffs' Motion for Summary Judgment, it relied on a string of cases defining the present "product line" theory of successor corporation liability for strict liability torts.  From the trend formed by these opinions, the district court "predicted" how the New Jersey Supreme Court would rule under the present factual circumstances. The district court held that the product line doctrine of successor liability originally adopted in Ramirez v. Amsted Industries, Inc., 431 A.2d 811 (N.J. 1981), should be applied to include circumstances where a predecessor corporation improperly disposed of toxic manufacturing by-products on its factory site and then sold its entire product line patented process, good will, inventory, sales records and trade name, but not the factory site itself, to a successor corporation which continues the same manufacturing process at different site.  Upon review of the line of cases dealing with the "product line" theory of successor corporate liability in products liability cases, I believe that the district court was correct in determining that the New Jersey Supreme Court would apply the strict liability doctrine to a strict liability environmental tort under these factual circumstances.

B.    Analysis

This is not a case where the corporate successor purchases some of the land that the predecessor contaminated and then continued a separate business on that land.  Therefore,

State Dept. of Environmental Protection v. Exxon Corp., 376 A.2d 1339 (N.J. Super. Ct. Ch. Div. 1977), is distinguishable. This case is, however, more like Ramirez, supra, in that Welsbach's product line could be considered as all or substantially all of the manufacturing assets which were acquired by Kerr-McGee's predecessors. Thus, even if the assets were acquired exclusively for cash, and Kerr-McGee and its predecessors undertook essentially the same manufacturing operation as Welsbach, Kerr-McGee should be strictly liable for injuries caused by defects in units or by waste from production of those units of the same product line, even if previously manufactured and distributed by Welsbach. See Ramirez, 431 A.2d at 825.

The policies in Ray v. Alad Corp., 560 P.2d (Ca. 1977), and Ramirez, supra, apply similarly to the present case. First the plaintiff's potential remedy against Welsbach, the original manufacturer who caused the contamination, was destroyed by the Kerr-McGee's purchase of Welsbach's assets, trade name, good will and Welsbach's resulting dissolution. In other words, Kerr-McGee's acquisition destroyed whatever remedy plaintiff might have had against Welsbach. Second, the imposition of successor corporation liability upon Kerr-McGee is consistent with the public policy of spreading the risk to society at large for the costs of injuries from contamination due to a product line. This is because the successor corporation is in a better position to bear accident-avoidance costs. In this case, Kerr-McGee is in a better position to bear the costs because Welsbach transferred to Kerr-McGee the resource that had previously been available to

Welsbach for meeting its responsibilities to persons injured by the product line it operated. Third, the imposition upon Kerr-McGee of responsibility to answer claims of liability for injuries allegedly caused by Welsbach's product line is justified as a burden necessarily attached to its enjoyment of Welsbach's trade name, good will and the continuation of an established manufacturing enterprise. For "[p]ublic policy requires that having received the substantial benefits of the continuing manufacturing enterprise, the successor corporation should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear." Ramirez, 431 A.2d at 822. "[I]n light of the social policy underlying the law of products liability, the true worth of a predecessor corporation must reflect the potential liability that the shareholders have escaped through the sale of their corporation." Id. To avoid such liability Kerr-McGee could have "obtain[ed] products liability insurance for contingent liability claims, and it [could have entered] into full or partial indemnification or escrow agreements with the selling corporation." Id. at 823; see La Pollo v. General Electric Co., 664 F. Supp. 178 (D.N.J. 1987).

Kerr-McGee, like Bruno in Nieves v. Bruno Sherman Corp., 431 A.2d 826 (N.J. 1981), was able "to gauge the risks of injury from defects in the [Welsbach] product line and to bear the accident-avoidance costs, "since Kerr-McGee was intimately familiar with the production of gas mantles and the unavoidable thorium manufacturing waste. Id. at 830. Evidence to support this conclusion is found by Lindsay's acquisition of all the

assets and sources of information related to the Welsbach product line. The liability also should apply to Kerr-McGee because Kerr-McGee's "acquisition of the business assets and manufacturing operation of [Welsbach] contributed to the destruction of the plaintiff's remedies against the original manufacturer" – Welsbach. Id. at 831. Finally, like State Dept. of Environmental Protection v. Ventron Corp., 468 A.2d 150 (N.J. 1983), I believe that this Court should follow the New Jersey Supreme Court's application of strict liability in environmental torts, see Department of Transportation v. PSC Resources, Inc., 419 A.2d 1151 (N.J. Super. Ct. Law Div. 1980), and apply product line strict liability to this environmental tort.

The district court in this case "predicted" that the New Jersey Supreme Court would apply the Ramirez successor corporation strict liability product line doctrine to strict liability environmental actions. Since this is an issue of first impression in New Jersey, the district court truly was "predicting" the result. Hence, if permitted to prognosticate, I too would hold that the New Jersey Supreme Court would apply the doctrine of strict liability to this environmental case and thus affirm the district court. However, while I believe that the decision to apply the doctrine to environmental cases should be left in the hands or the highest state court, there is no method to certify such a question to the court.

C.    The Restraint of City of Philadelphia

Despite my firm conviction that the district court should be affirmed, I am constrained by the philosophical tenet

of this court in City of Philadelphia, supra, which I respect and adopt. We are not appointed to be activists but to interpret and apply the law as we see it. However, I believe that a dangerous precedent will be set if this court continues down the path which prohibits direct application of state doctrines. Primarily, the removal and jurisdictional statutes will be used as a sword to prevent final resolution of a state claim. For example, where a defendant realizes that the state's highest court has not ruled on their specific factual circumstance, but has developed a doctrine that might be adverse to that defendant, then the defendant will most assuredly remove the case to federal court knowing that, on appeal, the circuit court will grant summary judgment in their favor based on City of Philadelphia. The result will create an atmosphere where state rights will never be vindicated and cases will not proceed to their ultimate conclusion.

Accordingly and reluctantly, I join the majority remanding this matter to the district court for entry of a summary judgment in favor of Kerr-McGee.