**Thomas A. AMADER, Jr., and Dorothy D. Amader, his wife, Plaintiffs,**

v.

**PITTSBURGH CORNING CORPORATION, Defendant.**

**No. 79–4546.**

United States District Court, E. D. Pennsylvania.

July 26, 1982.

See also, D.C., 541 F.Supp. 1384.

Norman Perlberger, Mitchell Cohen, Philadelphia, Pa., for plaintiffs.

Edward David, Philadelphia, Pa., for defendant.

## BENCH OPINION REGARDING PRODUCT LINE EXCEPTION TO SUCCESSOR LIABILITY

TROUTMAN, District Judge.

In this asbestos case, plaintiffs have, on the eve of trial, filed an in limine motion seeking admission of evidence relating to the product line exception to successor liability together with appropriate jury instructions, should the plaintiffs succeed at trial in establishing the necessary basis and the requirements for the application of said exception. The defendant, Pittsburgh Corning, objects contending that the exception is not the law of Pennsylvania and that the basis for its application does not here exist.

Concerned, as we are, with the product Unibestos, a high-temperature insulation product, plaintiff intends to establish in the course of the trial that as of July 1, 1962 Pittsburgh Corning acquired all assets including all real estate and fixtures relating to Unarco plants located in Tyler, Texas and Bloomington, Illinois which were used for the manufacture of Unibestos. Included within this acquisition was all equipment and machinery located at these plants for the production of Unibestos, inventories of Unibestos located at these plants which had not yet been sold by Unarco, business records relating to sale and distribution of Unibestos, all contracts, leases, licenses, patents and patent applications relating to Unibestos as well as raw amosite fiber on hand for the continuation of the Unibestos product line. The acquisition was so complete, plaintiff contends, that in addition to the above, Pittsburgh Corning also acquired the good will of Unarco relating to Unibestos as well as all trademarks and tradenames concerning the product, loan of scientific, technical and sales people from Unarco to assist Pittsburgh Corning Corporation in the transition of the product line, transfer of all

employees of Unarco who were located at plant facilities which manufactured Unibestos as well as transportation facilities to move the Unibestos from the plants to potential customers. With regard to the sales of Unibestos by Pittsburgh Corning, it also acquired all customer lists of Unibestos purchasers as well as the ability to utilize distributors and contractors located throughout the United States who had previously been used by Unarco for the purpose of distributing the Unibestos product.

Unarco, therefore, continued as a viable operating corporation thus precluding the application of the traditional approach to successor liability which generally required the dissolution of the predecessor corporation or at least its cessation of business activity.

Thus, in the diversity case in which the plaintiffs are New Jersey residents and the applicable law is that of the Commonwealth of Pennsylvania, we are obliged to determine or predict Pennsylvania law.

■ The inquiry regarding corporate successor liability commences with Pennsylvania law, for it controls the outcome of the diversity suit. See *Erie Railroad Company v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The requirements of Pennsylvania law are easily summarized: "Ordinarily, when one company sells or transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor simply by virtue of its succession to the transferor's property. In order to find that this general rule is not applicable and that the transferee does require such liability, one of the following must be shown: (1) the purchaser expressly or impliedly agrees to assume such obligation; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is fraudulently entered into to escape liability." See *Husak v. Berkel, Inc.,* 234 Pa.Super. 452, at pages 456–57, 341 A.2d 174, at

176 (1975). See also *Knapp v. North American Rockwell Corporation,* 506 F.2d 361 (3d Cir. 1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975). Thus the historical law of the Commonwealth of Pennsylvania may be summarized.

Now, the motion before the Court is premised upon a theory of law first explored in *Ray v. Alad Corporation,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977) which holds a successor corporation liable where there is: "The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." See also *Jacobs v. Lakewood Aircraft Service, Inc.,* 512 F.Supp. 176 at page 183 (E.D.Pa.1981), an opinion written by the then Chief Judge Lord.

New Jersey adopted this same rule, that is, the "product line exception" in *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981) and described the application of the rule as follows: "Where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor."

The Superior Court of Pennsylvania recently adopted the product line exception in *Dawejko v. Jorgensen Steel Company,* 290 Pa.Super. 15, 434 A.2d 106, 110–12 (1981). *Dawejko,* an intermediate appellate court decision, must be given "proper regard" in determining whether the Pennsylvania Supreme Court will adopt the product

line exception. See *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1966); *King v. Order of Travelers,* 333 U.S. 153, 160–61, 68 S.Ct. 488, 492–493, 92 L.Ed. 608 (1948); *West v. A.T. & T.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940). Importantly, the district courts in this circuit were recently cautioned that changes in "basic tort law" should emanate from the Supreme Court and not the Superior Court. See *Vargas v. Pitman Manufacturing Company,* 675 F.2d 73, 76 (3rd Cir. 1982).

■ With this in mind, and upon evaluation of the Pennsylvania decisions in the light of "other relevant data," see *McKenna v. Ortho Pharmaceuticals Corporation,* 622 F.2d 657, 663 (3rd Cir. 1980), we conclude that the Pennsylvania Supreme Court will follow the well-reasoned and documented decision in *Dawejko* and adopt the "product line exception." Moreover, we conclude that its application under the facts alleged is therefore warranted in the case at bar.

In making this determination, we have carefully considered but necessarily rejected Pittsburgh Corning's attempt to narrowly confine *Dawejko* to its specific facts. Instead, we rest our ruling upon the "social policies underlying strict products liability" and take care not to construe the product line exception "too tightly." See the *Dawejko* case 434 A.2d at page 111.

The pertinent factors which we consider are listed in *Dawejko:* whether the successor corporation advertised itself as an ongoing enterprise; whether it maintained the same product name, personnel, property and clients; whether it acquired the predecessor corporation's name and good will and required the predecessor to dissolve. We also consider whether the *Ray v. Alad Corporation, supra* test has been met and the factors considered by the *Ramirez v. Amsted Industries, Inc., supra,* court. Among the factors which support the imposition of successor liability are the fact that upon Pittsburgh Corning's purchase of the Un-

ibestos product line, Pittsburgh Corning maintained the same product, the same name, personnel, property, and apparently many of the same clients. Although Unarco, the predecessor corporation, did not dissolve upon Pittsburgh Corning's purchase of the Unibestos product line, it, Unarco, ceased to manufacture Unibestos.

Moreover, the *Ramirez* standard which *Dawejko* specifically adopted has been met here. Pittsburgh Corning acquired all or substantially all of the Unibestos manufacturing assets of Unarco, and it undertook to manufacture the same product in the same fashion as had Unarco.

Defendant asserts that failure to purchase all of Unarco's assets in 1962, rather than just the Unibestos product line, requires rejection of *Dawejko.* Additionally, Pittsburgh Corning argues that *Ray v. Alad Corp., supra,* requires that plaintiff's rights against the original corporation be extinguished by the corporate acquisition. Here, of course, plaintiffs' rights against Unarco were not extinguished by Pittsburgh Corning's purchase of the Unibestos product line. Rather, plaintiffs contend that their rights against Unarco may be extinguished by virtue of a contemplated bankruptcy. We do not base our conclusion upon a contemplated bankruptcy which is not yet fact. However, these arguments we think, as asserted by Pittsburgh Corning, unfairly straitjacket the *Dawejko* decision. True, the decided cases articulate that the purchasing corporation must obtain all or substantially all of the acquired corporation's assets. However, the cases which state this requirement do so, we think, because those were the facts then before the Court in those respective cases.

Given the fact that Pennsylvania has cautioned against a narrow construction of the product line and has emphasized that the social policies underlying strict liability gain expression through application of this doctrine, we believe that it applies where one corporation acquires a complete product line, including manufacturing and distribu-

tion outlets, and continues to manufacture the very same product. Fortunately for us, we are not without guidance from responsible and recognized judicial sources as to whether, aside from the *Dawejko* case, the Pennsylvania Supreme Court is likely to adopt the product line exception and whether, therefore, we are justified in predicting that the product line exception is the law of Pennsylvania.

Of not much consequence, but a fact which we do not pass over lightly, is the fact that as early as April 3, 1981, then Chief Judge Lord, now Chief Judge Emeritus, of this district, in the case of *Jacobs v. Lakewood Aircraft Service, et al.*, 512 F.Supp., 176 at 182 "assumed" the application of the exception in applying the law of this Commonwealth. True, he did not under the facts there proven apply the rule, but neither did he predict that it was not the law of Pennsylvania.

More importantly, of course, and more recently, on August 14th, 1981, the Superior Court of Pennsylvania, speaking through Judge Spaeth, has in the *Dawejko* case expressly adopted the product line exception as the law of Pennsylvania. It has done so only after extended and thoughtful review of all applicable authorities including the case of *Ramirez* from which we have already quoted. Moreover, and important to our decision here, Judge Spaeth relied upon the Third Circuit of Appeals, by whose decisions this Court is unequivocally bound. He cited the case of *Knapp v. North American Rockwell Corporation*, 506 F.2d 361 (3rd Cir. 1974) in which the circuit court held that the "sale of assets" there involved "should be treated as a merger" (page 367). Important to that decision were facts similar to those here alleged, such as the temporary continuation of the predecessor corporation, the preservation of its business organization intact for the benefit of the successor, the availability of officers and employees and the maintenance of customer and supplier relationships.

In support of its decision and conclusion, the Circuit Court, speaking through Judge Adams, said: "If we are to follow the philosophy of the Pennsylvania courts that questions of an injured party's right to seek recovery are to be resolved by an analysis of public policy considerations rather than by a mere procrustean application of formalities, we must, in considering whether the exchange was a merger, evaluate the public policy implications of that determination."

Thus, we have the Circuit Court of Appeals as early as 1974 expressing and relying upon principles of "public policy," as opposed to the "application of formalities" which, if applied to the facts here involved, predicted the adoption of the product line exception by Pennsylvania courts.

Of not much weight, but we also have the "assumption" of the adoption of such exceptions by the Chief Judge of this district in April, 1981. We have the actual adoption of the exception by the Superior Court of Pennsylvania speaking through Judge Spaeth in an exhaustive and well-written opinion in the *Dawejko* case in August, 1981.

Finally, we have the Pennsylvania Supreme Court abolishing the doctrine of governmental immunity in 1973, a doctrine designed for the protection of *all* citizens, basing that decision upon the simple public policy statement: "the city is a far better loss-distributing agency than the innocent and injured." See *Ayala v. Philadelphia Board of Education*, 453 Pa. 584, 594 and 595, 305 A.2d 877, 882 (1973). Such public policy, now declared by the Supreme Court of Pennsylvania, leaves no doubt of the ultimate adoption of the exception by that court based upon the cases cited in the *Dawejko* case and other cases cited by counsel in support of plaintiffs' motion. Accordingly, the motion is granted.

### BENCH OPINION REGARDING COLLATERAL ESTOPPEL

With respect to collateral estoppel, the motion to reargue will in fact be treated as

a motion to reconsider our memorandum and order of July 1, 1982, and filed on July 7th, 1982, 541 F.Supp. 1384. The motion to reconsider was served 12 days thereafter on July 19th, 1982.

Now, preliminarily, it may be noted that motions to reconsider "shall be served within 10 days after the entry of the judgment, order or decree concerned." See local R.Civ.P. 20(g). The Third Circuit has held that the local rules of this district must be given effect and that they cannot be ignored by the district courts. See *United States v. Ferretti*, 635 F.2d 1089, 1094 (3rd Cir. 1980). See also, *Schmidt v. Silver*, 89 F.R.D. 519 (E.D.Pa.1981). Consistent with that ruling, the Third Circuit also requires litigants to strictly follow local rules of appellate procedure. Appeals which do not comply with the local rules are properly dismissed. See *Kushner v. Winterthur Swiss Insurance Company*, 620 F.2d 404 (3rd Cir. 1980) (dismissing an appeal for failure to complete the index appended thereto, failure to append the lower court's docket entries and failure to note the names and addresses of counsel on the cover of the brief).

The courts within this district have faithfully and consistently applied the time limitations embodied in the local rules. In *Move Organization v. City of Philadelphia*, 89 F.R.D. 521 (E.D.Pa.1981), Judge Giles held that failure to oppose a motion within the time limitations contained in local R.Civ.P. 20(c) warranted granting the motion as unopposed. In *Consorcio Constructor Impregilo v. Mack Trucks*, 497 F.Supp. 591 (E.D. Pa. 1980), we held that failure to comply with local R.Civ.P. 7(IV)(a), regulating the time within which appeals from magistrates must be filed compelled denial of the appeal. In so holding, we observed that to sanction counsel's failure to comply with the time limitations contained in the local rules would "invite disregard of procedural requirements in all of the rules, cause a delay in disposition of disputes by creating confusion on trial dockets and prejudice the opposing party by injecting an unnecessary element of uncertainty into trial strategy and preparation. Worse, the rules' articulated purpose of securing the 'just, speedy and inexpensive determination of every action' would be reduced to an empyrean principle with no practical meaning."

We there also quoted *Bank Building and Equipment Corporation of America v. Mack Local 677 Federal Credit Union*, 87 F.R.D. 553, 555 (E.D.Pa.1980).

■ Specifically, Judge Fullam held in *Lewis v. R.D. Timpany*, No. 75–3289 (E.D.Pa. November 9, 1981) that a motion for reconsideration is properly denied where it is untimely. Hence, for this reason alone we properly deny the motion.

However, we prefer not to base our decision upon the rules and upon the time limitations mentioned. We feel that under the facts and circumstances of this case that there are additional reasons which should support our conclusion. The written motion asserted that based upon a recent rereading of *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) and upon "new" and unspecified facts that our decision was erroneous. At oral argument, National Liaison Counsel for Pittsburgh Corning asserted that the issues litigated in *Borel* are dissimilar to those currently before the Court and that a multitude of verdicts, inconsistent with *Borel*, have been generated. Hence, he urged that we erred in our prior opinion.

Treating first the purported lack of identity in issue between *Borel* and the case at bar, *Borel* specifically found that Unibestos was defective between 1962 and 1968 and that Pittsburgh Corning was accordingly "strictly liable." See *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d at 1086. And in passing, though not controlling, see *Amader v. Johns-Manville*, 541 F.Supp. 1384 at p. 1386 (E.D. Pa. 1982). Moreover, both Mr. Amader and Mr. Borel were insulators and were exposed to Unibestos on various jobs.

Furthermore, the fact that Texas law of strict liability is not completely coextensive with Pennsylvania law is irrelevant to the disposition of the motion at bar. When Borel was decided, Texas apparently required plaintiffs in 402A cases to prove *inter alia* that the product was "unreasonably dangerous." Pennsylvania law has no such requirement; plaintiffs' burden here is less demanding. See *Azzarello v. Black Brothers Company,* 480 Pa. 547, 391 A.2d 1020 (1978).

Pittsburgh Corning's assertion that juries have found that Unibestos was not defective and that we should not apply collateral estoppel need not detain us long. The jury verdicts which it has purportedly won are inefficient to create a collateral estoppel bar for several reasons: first, some are general verdicts and we are unable to discern the basis thereof; that is, juries could have found for Pittsburgh Corning on any number of issues including statute of limitations, lack of proximate cause, et cetera. Collateral estoppel goes to issue preclusion, and without jury interrogatories we cannot and therefore will not speculate as to the basis for a jury's decision. Secondly, a number of juries apparently found Unibestos not to have been defective between 1962 and 1968. However, due to plaintiffs' recoveries in those cases, no appeal was ever taken. As such, there was no "full and fair" opportunity to litigate.

As Pittsburgh Corning originally argued, an adverse jury finding which cannot be appealed from due to a favorable verdict is not considered a "final" judgment for present purposes. See Pittsburgh Corning's Answer to Plaintiff's Motion for Summary Judgment, document 741 at pages 12 and 13. Also see *Digiacomo v. Johns-Manville Corporation,* No. 76–604, slip opinion at page 5 (D.N.J. May 3rd, 1982). Also see *Amader v. Johns-Manville,* 541 F.Supp. 1384 at p. 1385 (E.D.Pa.1982).

Our prior opinion was rendered only after substantial briefing by the parties which included supplemental and reply briefs and oral argument. Our opinion was based upon a thorough study of the principles underlying the collateral estoppel doctrine and of the *Borel* case, a decision handed down nine years ago. Defendant's somewhat untimely assertion that "new" facts have come to light with respect to *Borel* and that these facts could not have been discovered by Pittsburgh Corning during the prior briefing process strains the imagination; nevertheless, we have reconsidered our prior ruling.

Because we conclude that the "new" facts asserted in oral argument are not "new" and are legally insufficient in any event to change the results previously reached, we will deny the defendant's motion for reconsideration.