190 P.3d 102 (2008)
Harold F. PAYNE and Elizabeth Payne, husband and wife, Respondents,
v.
SABERHAGEN HOLDINGS, INC., as successor to Tacoma Asbestos Company and The Brower Company; Allis-Chalmers Corporation, Individually and as successor in interest to Buda Corporation; American Standard, Inc., Individually and as parent and alter ego of American Boiler Corp., Westinghouse Air Brake Company and Kewanee Boiler Company, a division of American Radiator *103 & Standard Sanitary Company; Aqua-Chem, Inc., Individually and as successor to Cleaver-Brooks Company; Borg Warner Corporation, n/k/a Burns International Services Corporation; BW/IP International, Inc., f/k/a Borgwarner Industrial Products, successor-in-interest to Byron Jackson Pump; Carrier Corporation, Individually and as successor-in-interest to Bryant Heating & Manufacturing Co.; Elliott Company; Fairbanks Morse Pump Corporation; Flowserve Corporation, Individually and as successor-in-interest to Pacific Pumps and Durco Pumps; General Electric Company; Goulds Pumps (IPG), Inc.; Ingersoll-Rand Company; J.T. Thorpe & Son, Inc.; Leslie Controls, Inc.; Babcock Borsig Power, Inc., f/k/a D.B. Riley, Inc., f/k/a Riley Stoker Corp.; Viacom, Inc., Individually and as successor by merger to CBS Corporation, f/k/a Westinghouse Electric Corporation; Warren Pumps, Inc., Individually and as successor-in-interest to Quimby Pump Company, Defendants,
Viad Corporation, Individually and as successor to Griscom-Russell Company, Appellant, and
Yarway Corporation, Defendant.
No. 58638-6-I.
Court of Appeals of Washington, Division 1.
August 18, 2008.
*105 David S. Frockt, Bergman & Frockt PLLC, Seattle, WA, for Respondents.
Philip Albert Talmadge, Talmadge Fitzpatrick, Emmelyn Hart-Biberfeld, Talmadge Law Group PLLC, Tukwila, WA, Ronald Clayton Gardner, Gardner Bond Trabolsi PLLC, Seattle, WA, for Appellant.
GROSSE, J.
¶ 1 There are only limited circumstances under which a purchaser of corporate assets acquires a transferor's liabilities, such as by de facto merger or by continuing the same product line. Here, there are no such circumstances. Viad Corporation's predecessor, Baldwin-Lima-Hamilton (PA), did not acquire Griscom-Russell's asbestos-related liabilities when it purchased Griscom-Russell's parent company, Hamilton Thomas, in 1962. Harold and Elizabeth Payne have failed to present evidence of continuity of ownership of the merged company, required for finding a de facto merger, and failed to present evidence of sales made after the purchase, indicating the continuation of the *106 same product lines. We reverse the trial court.

FACTS
¶ 2 In a personal injury suit, Harold Payne alleges he was exposed to asbestos used in conjunction with evaporators and fuel oil heaters manufactured by Griscom-Russell Corporation (GR) while serving in the United States Navy as a boiler operator and technician from 1952 to 1981. In August 2005, he was diagnosed with mesothelioma, an invariably fatal cancer closely linked with prior asbestos exposure. Harold Payne and his wife, Elizabeth Payne (hereinafter Payne), Oregon residents, filed a personal injury suit in King County Superior Court on November 1, 2005 against numerous defendants, including Viad Corporation (Viad).
¶ 3 Payne sued Viad as the corporate successor-in-interest to GR. Viad is incorporated in Delaware and its business transactions are widespread. During the 1950s and early 1960s, GR manufactured marine engineering products including fuel oil heaters and evaporators used for desalinization of seawater onboard naval vessels. These GR products were in use on approximately half of United States Navy vessels at one point while Payne served. While not dangerous or defective as sold, proper usage of these GR products required insulation and the United States Navy used asbestos to this end. This court has already held that Viad, if GR's successor, may potentially be held strictly liable for failure to warn of inherent dangers when its product required the use of another product and the two together caused a release of a hazardous substance, asbestos.[1] Harold Payne contends he was exposed to asbestos during routine maintenance on GR equipment onboard naval vessels at sea and does not assign his exposure to any specific incident(s), leaving the location of the purported injury unknown.
¶ 4 Viad denies that it is GR's corporate successor and thus not responsible for any of GR's asbestos-related liabilities. Viad alternatively defends arguing that GR neither owed nor breached a duty to warn Payne and denies that asbestos, used in conjunction with GR products, substantially contributed to Payne's mesothelioma. The first issue of Viad's liability as corporate successor to GR was severed for trial and is the only issue we address on appeal.
¶ 5 Prior to trial, Viad moved to apply the law of Delaware to the issue of Viad's successor liability. Payne objected and the trial court reserved its decision regarding the applicable law pending the conclusion of trial. At trial, the parties presented competing evidence, much of it circumstantial, regarding the disputed events of 1962 and 1965. Only two witnesses testified: one in-person[2] and the other through videotaped perpetuation deposition testimony.[3] After a four day bench trial, the trial court ruled against Viad, finding it responsible for any GR asbestos-related liabilities as GR's corporate successor or through its continuation of the pertinent GR product lines. Finding Viad's corporate predecessor acquired any GR asbestos-related liabilities in 1962 through de facto merger or, alternatively, under the product line exception and having retained any such liabilities during the contested events of 1965, the trial court entered partial final judgment against Viad on successor liability on July 31, 2006.[4] Viad appeals.

ANALYSIS
¶ 6 While the chain of companies and transactions connecting GR to Viad is complicated, only two transactions are germane to determining Viad's successor liability vis-à-vis GR and Payne's claims sounding in tort. First, in 1962, Baldwin-Lima-Hamilton (BLHPA), a Pennsylvania corporation, Viad's *107 corporate predecessor, purchased a 93.4 percent interest in GR's parent company, Hamilton Thomas. The trial court found that BLHPA acquired GR's asbestos-related liabilities in a de facto merger through its purchase and its subsequent actions consolidating and exercising control over Hamilton Thomas' wholly owned subsidiary, GR. BLHPA was found to have substantively acquired GR in its entirety as opposed to merely purchasing its assets. Alternatively, the trial court determined BLHPA acquired GR's asbestos-related liabilities in 1962 under application of Pennsylvania law's product line exception to the general rule of nonliability for corporate successors. The court held that BLHPA continued GR's product lines pertinent to Payne's claims after its asset purchase.
¶ 7 Secondly, the court held that in 1965, by statutory merger, BLHPA passed any liabilities it had acquired from GR in 1962 (under either theory of liability) to Armour & Company. Further, the trial court found Viad's position that any such liabilities were immediately transferred to a separate tax free entity, Baldwin-Lima-Hamilton, a Delaware corporation (BLHDE), after the 1965 merger between BLHPA and Armour & Company unpersuasive. Viad is corporate successor to Armour & Company but not to BLHDE. Therefore, Viad was held liable for any GR liabilities acquired by BLHPA in 1962.

1962 De Facto Merger
¶ 8 Because Washington, Delaware, and Pennsylvania law are in accord with regard to the well settled general principles of corporate law governing statutory and de facto mergers, the trial court's application of Washington law was proper.[5]
¶ 9 The general rule is that there is no corporate successor liability. Thus, where a company sells its assets to another company, the purchaser is not liable for the debts and liabilities of the selling company, including those arising out of the seller's tortious conduct.[6] There are four traditional narrow exceptions to this general rule:
(1) the successor expressly or impliedly assumes the obligations of the predecessor, (2) the transaction is a de facto merger, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.[[7]]
The only traditional exception the trial court found applicable to the events in 1962 is that of de facto merger between BLHPA and GR. A merger or consolidation occurs when there is a union between two or more corporations that results in either the absorption of one by the other or the creation of a new corporation. After a merger, whether statutory or de facto, the surviving company is responsible for the merged (or subsumed) company's liabilities.[8] De facto merger is a judicial framework for analyzing the substance of a transaction over its form.[9] A court considers four factors in a de facto merger analysis: (1) continuity of the business (including personnel and management, physical location, operating, use of brand names); (2) continuity *108 of ownership; (3) seller's existence ceasing as soon as legally and practically possibly; and (4) if the purchaser expressly or impliedly assumes the seller's obligations.[10] Not all four elements must be present to find an asset purchase constitutes a de facto merger. Nonetheless, continuity of ownership has repeatedly been held essential.[11]
¶ 10 In Uni-Com Northwest, Ltd. v. Argus Publishing Co., this court observed that a de facto merger "only occurs when the consideration flowing to the selling corporation is shares of the purchasing corporations stock, as opposed to cash."[12] In Fox v. Sunmaster Products, Inc., we summarized:
Generally, a de facto merger is found where a seller corporation continues its business existence as an absorbed part of the buyer and the sellers shareholders or officers continue their interest in the business after the dissolution of the selling corporate entity. Usually the sellers shareholders acquire shares in the purchaser corporation in exchange for their stock, rather than selling for cash. The rationale behind imposing liability on the purchaser when shares rather than cash is given for the purchase is that the sellers stockholders retain an ownership interest in the continued business operations.[[13]]
¶ 11 Here, BLHPA purchased 93.4 percent of GR's parent company (Hamilton Thomas) for cash in January 1962. There is simply no evidence whatsoever showing that GR shareholders or owners ever received BLHPA stock. Payne's reliance on Atlas Tool Co., Inc. v. C.I.R.[14] for the proposition that continuity of stock ownership is not required in order to find an asset purchase constitutes a de facto merger is misplaced. In Atlas, the same person owned all controlling stock of both the transferor (the company allegedly subsumed by de facto merger) and the purchasing (or surviving) company.
¶ 12 Payne bears the burden of demonstrating that there was a statutory or de facto merger in 1962 as opposed to an asset or stock purchase for cash. While a merger transfers GR's debts and liabilities to BLHPA, a purchase of assets for cash does not. Some evidence, however indirect or circumstantial, must have been presented by Payne to support the trial court's finding that there was continuity of ownership in its de facto merger analysis. Mere speculation or conjecture will not sustain a finding.[15] Here, there is no evidence to support the finding of a de facto merger. The trial court found the continuity of ownership element satisfied by finding the management of GR and ownership by BLHPA of GR's voting stock after the time of BLHPA's January 1962 purchase of GR's parent company, Hamilton Thomas, through the time of GR's dissolution in April 1962 did not change. But, continuity of ownership in the merged (here, purportedly GR) company must also be present prior to the asset purchase in order to find a de facto merger that would transfer GR liabilities to BLHPA whereas a mere asset purchase for cash would not.
¶ 13 Because an absence of evidence demonstrating continuity of ownership in the merged company bars finding a de facto merger between BLHPA and GR, we do not address the sufficiency of evidence supporting the other three factors a court considers in a de facto analysis. GR's asbestos-related liabilities were not transferred to BLHPA in 1962 via de facto merger.

1962Product Line Exception
¶ 14 The trial court applied Pennsylvania law to the events in 1962 when it held Viad potentially liable under the product line *109 exception to the general rule of successor nonliability. Viad argues that Delaware, which has not adopted the product line exception, is the law that should be applied.
¶ 15 In resolving conflict of law tort questions, Washington follows the Restatement (Second) Conflict of Laws most significant relationship with the occurrence and the parties rule.[16] The contacts typically considered in a tort conflict of law analysis include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.[[17]]
Application of the most significant relationship rule is two-fold. A court must first evaluate the contacts with each potential state and then, only if evenly balanced, will a court "evaluat[e] ... the interests and public policies of the concerned states, to determine which state has the greater interest in determination of the particular issue."[18] Furthermore, contacts are not merely counted, but rather their significance and where they are found are considered.[19]
¶ 16 Notably, no potentially interested state (whether Delaware, Washington, Pennsylvania, Oregon, or even Ohio) has particularly strong contacts with the occurrence, or the events pertinent to Payne's products liability claim. There is no actual relationship between Viad and Payne except for this litigation. Payne is a resident of Oregon. Hamilton Thomas, GR's parent company, was an Ohio company. GR manufactured the pertinent product lines in, Ohio before their purported transfer to BLHPA's manufacturing site in Eddystone, Pennsylvania. There are similarly few contacts with the state of Washington beyond its being the forum state for this litigation. Delaware's contacts are limited to the incorporation and dissolution of GR and are of little relevance to the occurrence giving rise to Payne's claims.
¶ 17 To determine which law applies, we focus on the contacts that are pertinent to Payne's products liability claim.[20] Here, Payne alleges he was exposed to asbestos used in conjunction with GR products while serving on various naval vessels. Pennsylvania has several contacts that are as significant to Payne's allegations in relation to his products liability claims against Viad vis-à-vis GR. BLHPA was a Pennsylvania company. The manufacturing site where in 1962 at least some of GR's manufacturing equipment, personnel, technology, partially relating to the manufacture of marine distilling units and oil fuel heaters at issue was located in Pennsylvania. These factors support the trial court's determination that Pennsylvania law applies for the product line exception.
¶ 18 The intermediate appellate court of Pennsylvania adopted the product line exception or doctrine in Dawejko v. Jorgensen Steel Co., holding that a successor corporation may be liable for defects in products if it continues to manufacture the same product as its predecessor.[21] Pennsylvania's Supreme Court, its highest court, has not yet addressed this doctrine. However, the doctrine has been applied by Pennsylvania trial courts, intermediate courts, and federal courts sitting in diversity.[22] Washington's *110 Supreme Court adopted the product line exception in Martin v. Abbott Laboratories, finding a successor manufacturer could be liable under market share theory of liability for claims arising from DES (diethylstilbestrol) exposure after it purchased manufacturing business and continued output of the same line of products.[23]
¶ 19 Under the product line exception, a purchasing corporation is strictly liable for injuries caused by defects in the same product line, even if previously manufactured and distributed by its predecessor.[24] This additional exception to the four traditional exceptions to the general rule of nonliability for a purchasing successor is unique to product liability claims. Unlike de facto merger, this doctrine requires no continuity of ownership.[25]
¶ 20 The Dawejko court reasoned the general rule of successor nonliability may lead to unjust results in strict tort liability claims, frustrating the purpose or social policies underlying strict tort liability for manufacturers of defective products.[26] Such liability is meant to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves and to spread the cost of compensating such persons throughout society.[27] While in Dawejko, the Superior Court of Pennsylvania adopted the New Jersey Supreme Courts broad and flexible formulation of the product line exception in Ramirez v. Amsted Industries, Inc.;[28] the court later clarified in Hill v. Trailmobile, Inc.[29] that the three factors enunciated by the California Supreme Court in Ray v. Alad Corp.[30] are requisite to finding the product line exception applicable. The three Ray factors now required to extend liability to a successor manufacturer under Pennsylvania law are
(1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading r[o]le, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being employed by the successor in the continued operation of the business.[[31]]
¶ 21 In Burnside v. Abbott Laboratories, Pennsylvania declined to apply the product line exception to a successor that no longer manufactured or distributed the product a plaintiff claimed caused their injuries.[32] Application of product line exception is limited, as explained by the Martin court:
This narrowly drawn rule strikes a fair balance among the competing considerations of products liability and corporate acquisitions. Imposition of liability is properly based on the successor's receipt of a benefit from the predecessor's product line. The benefit of being able to take over a going concern manufacturing a specific product line is necessarily burdened with potential products liability linked to the product line. This standard allows the parties to a transfer to consider potential products liability and in fairness to the *111 competing considerations still leaves some claimants uncompensated and some forms of transfer immune.[[33]]
¶ 22 A successor corporation presumably has a greater ability to spread risk among future consumers of the same product while simultaneously benefiting by assuming the old corporation's good will and thus it is fair that the successor should be held liable for harms associated with those products.[34] Here, however, Payne failed to present any evidence that Viad's predecessor, BLHPA, continued to manufacture and sell the same product at all, or, the same naval evaporators or fuel oil heaters alleged to have caused Payne's injuries. Payne has failed to present any evidence from which a court could infer that BLHPA actually manufactured or sold a single shipboard evaporator or fuel oil heater after its purchase of GR's parent company, Hamilton Thomas, in 1962. Moreover, BLHPA's ability and desire to continue the pertinent product lines, even when evidenced by contemporaneous documents including advertisements and annual reports, does not prove that BLHPA actually continued these product lines. We have yet to find a case, whether from Pennsylvania or any other jurisdiction, where liabilities were transferred to a successor under this exception to the general rule of nonliability for corporate successors when it is unclear whether or not the successor even continued the same product line.[35] Absent proof of sales of the same product, even of just one unit, liability cannot be extended to a successor under this exception.[36] To hold otherwise would be an extension of the product line exception well beyond its past application under Pennsylvania law.
¶ 23 Purchasing the capability or rights to continue a particular product line alone does not pass the seller's liabilities to a successor manufacturer. Such a sale fails to satisfy the second prong of the Ray test, that a successor company assumes the original manufacturer's risk spreading role. All three elements of the Ray test must be satisfied in order to find a successor manufacturer liable under Pennsylvania law's product line exception. And it is only through sales of the continued product(s) that the successor assumes such a role. In Jacobs v. Lakewood Aircraft Service, Inc., the Eastern District Court of Pennsylvania found that when a successor had "a different plant, manufacturing equipment, inventories, personnel, management, and sales representatives" and "no work in progress, finished goods, or raw materials" was directly transferred, the acquisition did not give the purchaser "`the opportunity formerly enjoyed' by [the seller] to pass on to its customers the costs of meeting the risks of manufacturing defects."[37] At oral argument, Payne's counsel could not point to any evidence of actual sales and when pressed on that point, counsel responded that they wished they could. This defect in proof is fatal. The very "rationale underlying the product line exception, is that liability remains with the entity still deriving income from manufacturing the product line from which the injury arose" and thus the risk of injury may be spread over the purchasers of units within that product line.[38] Absent any proof of sales, as a matter of law, BLHPA cannot be found to have assumed the original manufacturer's ability to spread risk and therefore held liable under the product line exception for any injuries arising from contact with GR manufactured products.
¶ 24 While a dearth of evidence regarding actual sales of the pertinent GR marine engineering products after BLHPA's purchase of Hamilton Thomas is important to our decision, *112 this is not the only reason for our holding the product line exception inapplicable. We also find that Payne has failed to meet its burden satisfying the third prong of the Ray test, that regarding good will.
¶ 25 The product line exception extends a seller's liabilities to a successor manufacturer only where it is fair to do so and the third prong of the Ray test addresses this factor. "[T]he fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business."[39] To impose liability, the successor must have received the benefits from the predecessor's product line or its good will. Profits from sales is only one such benefit, though not an insignificant one.
¶ 26 Despite some contemporaneous documentary evidence, including advertisements and annual statements demonstrating that BLHPA acquired the expertise and technological capabilities of GR, the finding that BLHPA benefited from the good will of GR after its 1962 cash purchase is not supported by substantial evidence. As the dissent points out, BLHPA may have benefited from GR's reputation and brand-name, its personnel's knowledge and expertise, and even manufacturing equipment.[40] But good will, in this context, requires more. To hold otherwise would eviscerate the general rule of successor nonliability. If so held, the product line exception would entirely subsume the general and virtually universal rule of corporate successor liability that a purchaser of another's assets does not acquire its liabilities by virtue of its purchase alone.
¶ 27 Generally, courts have only found the third prong of the Ray test satisfied where the successor holds itself out as a continuation of the seller.[41] In determining whether fairness required successor liability because it was "`a burden [that had] necessarily attached to the original manufacturer's good will'" and was now "`employed by the successor in the continued operation of the business,'"[42] the Eastern District Court of Pennsylvania in Amander v. Pittsburgh Corning found a successor liable under the product line exception where the purchaser advertised itself as the ongoing enterprise of the seller, maintained the same product name, personnel, property (manufacturing site and equipment) and "apparently many of the same clients."[43] The Amander court specifically noted that the successor undertook to manufacture "the same product in the same fashion" as had the successor.[44] This is simply not the case here. There is no proof that BLHPA ever actually manufactured or sold any of the same fuel oil heaters or naval evaporators alleged to have caused Payne's injuries. Nor did BLHPA continue GR's business operations generally, holding itself out as a continuation of the same enterprise. Rather, as described in BLHPA's 1961 Annual Report, GR's products were described as "complement[ing] the product lines already manufactured by BLH." GR's Massillon, Ohio plant was closed shortly after BLHPA's purchase of Hamilton Thomas in 1962 and a disputed portion of its manufacturing equipment and operations were transferred to BLHPA's already existing Eddystone, Pennsylvania manufacturing facilities. Over 800 GR employees lost their jobs after the purchase and only a few personnel were retained by BLHPA. There is no evidence that that BLHPA ever held itself out to its customers or shareholders as a continuation of GR, rather, it stressed how its own expertise and *113 capabilities had been enhanced through its acquisition. GR's asbestos-related liabilities did not transfer to BLHPA after the latter's purchase in 1962.

1965Statutory Merger and BLHPE Transfer
¶ 28 Because we find that BLHPA did not acquire GR's asbestos-related liabilities in 1962 by either de facto merger or through continuing its pertinent product lines, we need not reach the disputed events of 1965. Since Viad's corporate predecessor, BLHPA, was never responsible for GR's asbestos-related liabilities, the events of 1965 are immaterial to Viad's successor liability.

Attorney Fees
¶ 29 Viad seeks attorney fees on appeal under Washington's long-arm statute.[45] Such an award is discretionary and is limited to the amount necessary to compensate a foreign defendant for the added costs of litigating in Washington.[46] We award Viad attorney fees under RAP 18.1 only to the extent necessary to compensate it for any additional costs of litigating in Washington. It may be the case that this amounts to zero.
¶ 30 For the above reasons, we reverse the trial court.
WE CONCUR: COLEMAN, J. Pro Tem.
SCHINDLER, C.J. (dissenting).
¶ 31 Following Pennsylvania law, the trial court concluded Viad was the corporate successor to Baldwin-Lima-Hamilton of Pennsylvania (BLHPA) and was liable for Payne's alleged exposure to asbestos from Griscom Russell (GR) products. The trial court found that after Viad's predecessor, BLHPA, purchased GR's parent company, Hamilton Thomas Corporation (HT), BLHPA continued to manufacture asbestos-related GR products and benefited from the goodwill of the GR name and product line. In my view, the majority discounts the substantial evidence supporting these findings. Instead, focusing on direct proof of sales, such as receipts, the majority concludes that "[a]bsent proof of sales of the same product, even of just one unit, liability cannot be extended to a successor," and that substantial evidence does not support the finding that BLHPA benefited from the goodwill of GR. Because the absence of sales receipts is not dispositive and ample evidence supports the trial court's finding that "in the years after the 1962 acquisition, BLH relied upon and benefited from the goodwill and heritage of the GR name and product line," I respectfully dissent. Under Pennsylvania's product line exception, the trial court's findings are sufficient to impose successor liability on Viad.
¶ 32 Under Pennsylvania law, the product line exception applies:
"[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor."
Dawejko v. Jorgensen Steel Co., 290 Pa.Super. 15, 434 A.2d 106, 110-11 (1981) (quoting Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 431 A.2d 811, 825 (1981)). The reason for adoption of the product line exception is "`the social policies underlying strict products liability.'" Dawejko, 434 A.2d at 111 (quoting Ramirez, 431 A.2d at 825). In adopting the product line exception, the Dawejko court cautioned against a narrow construction of the exception. Dawejko emphasizes the "social policies underlying strict products liability" in holding that the exception should not be phrased "too tightly," but rather in general terms "so that in any particular case the court may consider whether it is just to impose liability on the successor corporation." Dawejko, 434 A.2d at 111. Dawejko sets forth a number of factors the court should consider in determining whether the exception applies, including the factors *114 identified by the California court in Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). Dawejko, 434 A.2d at 111.
¶ 33 As the majority notes, the Pennsylvania court later recast the Ray factors as prerequisites that must be met in order to apply the product line exception to a successor corporation. Hill v. Trailmobile, Inc., 412 Pa.Super. 320, 603 A.2d 602 (1992). The first Ray factor is the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business. The second factor, the successor's ability to assume the original manufacturer's risk-spreading role, takes into consideration whether the acquisition had the effect of transferring to the purchaser the resources that had previously been available to the seller for meeting its responsibilities to persons injured by defects in the product:
While depriving plaintiff of redress against [the selling corporation] the transaction by which [the purchasing corporation] acquired [the selling corporation's] name and operating assets had the ... effect of transferring to [the purchasing corporation] the resources that had previously been available to [the selling corporation] for meeting its responsibilities to persons injured by defects in [the products] it had produced. These resources included not only the physical plant, the manufacturing equipment, and the inventories of raw material, work in process, and finished goods, but also the know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and the consulting services of [the selling corporation's] general manager.
Ray, 136 Cal.Rptr. 574, 560 P.2d at 9. The third Ray factor considers the fairness of requiring the successor corporation to assume the burden of accepting responsibility for the original manufacturer's defective products. In determining whether it is fair to impose liability on a successor corporation, the court considers,
whether the successor corporation advertised itself as an ongoing enterprise; or whether it maintained the same product, name, personnel, property, and clients; or whether it acquired the predecessor corporation's name and goodwill, and required the predecessor to dissolve.
Dawejko, 434 A.2d at 111(citations omitted).
¶ 34 The majority primarily focuses on the absence of sales receipts of "even just one unit," but also asserts that BLHPA did not benefit from the goodwill of the GR name and product line. The majority discounts the evidence in the record that for two or three years after purchase, BLHPA continued to manufacture and service GR products and capitalized on GR's name and goodwill. Substantial evidence supports the Ray factors and the trial court's conclusion that Viad is liable as the successor corporation to BLHPA under the product line exception as articulated in Pennsylvania law. In reaching the determination that Viad is liable, the trial court expressly relied on the contemporaneous documentary evidence instead of the testimony of Peter Novak and Henry Rentschler.[1]
¶ 35 In January 1962, BLHPA acquired all or substantially all of the assets of GR and undertook the same manufacturing operations as part of the Industrial Equipment Division in Eddystone, Pennsylvania. There is no dispute that in January 1962, when BLHPA acquired HT and its subsidiary GR, GR was the leading manufacturer of marine heat exchangers, condensers, evaporators, and distilling plants. There is also no dispute that prior to acquisition, BLHPA did not manufacture these products. The BLHPA Annual Report for 1961, published in early 1962, describes the acquisition of GR and the new product lines, including condensers and distilling plants.

*115 In January, 1962, we acquired control of Hamilton-Thomas Corporation, Hamilton, Ohio, by purchasing substantially all of its capital stock. This acquisition gives us the products of the principal Hamilton-Thomas subsidiaries: ... Griscom Russell Company, Massillon, Ohio.
The Hamilton-Thomas products complement product lines already manufactured by BLH, and this is consistent with the philosophy of our diversification which is that our acquisitions must either enable us to broaden our participation in markets which we serve already or bring us into fields in which we can make worthwhile contributions.
The new products obtained through this acquisitionfeed water heaters, condensers and evaporatorsprovide BLH with additional equipment for the power industry to which we already supply hydraulic and pump turbines....
* * *
Hamilton-Thomas products also augment the BLH marine product line, adding surface condensers, steering and materials handling equipment, and sea water distillers to our propellers, shafting and shipboard missile handling and launching equipment.
The Annual Report for 1961 also notes that "[o]f considerable interest among the new products are the evaporators for sea water distillation." According to the Annual Report, GR "has supplied distilling plants to well over half of all of the United States Ships in service."
¶ 36 Moody's Industrial Manual for 1962 provides information on the acquisition by BLHPA of HT and GR and the GR product line.
Subsidiaries Acquired January 30, 1962:
Hamilton-Thomas Corp. (Del.) (93.4%)
C.H. Wheeler Mfg. Co. (Pa.) (99.7%)
Griscom-Russell Co. (Del.) (99.9%)
Grissell Realty Corp. (Ohio) (100%)
Smart-Turner Machine Co., Ltd. (Ont.) (100%)
C.H. Wheeler Mfg. Co. (Canada) Ltd. (Ont.) (100%)
Griscom-Russell Co. (Canada) Ltd. (Ont.) (100%)
Business & Products
Company has a widely diversified business, principally in the durable goods field. Construction equipment represents a substantial portion of output.
The 1962 Manual also notes that "[n]ewly acquired Grissom-Russell Co. produces evaporators for sea water, used by numerous ships."
¶ 37 The BLHPA Annual Report for 1962 states that the manufacture of GR products moved to Eddystone and sales were significantly higher than the previous year, "resulting primarily from acquisition of HT and its products." The Annual Report for 1962 also contains drawings that depict many of the products that BLHPA manufactured. Underneath a drawing of a distilling plant is the statement that "Griscom-Russell sea water distilling plants, such as this one, are in use on more than half of all United States Ships in service. The units are now manufactured by BLH." The caption under another drawing of a land based sea-water distillation plant states that "[e]vaporators, such as the one shown, are used in power plants to produce boiler feedwater from raw water ... BLH builds evaporators for utility, marine and industrial uses."
¶ 38 In addition, the BLHPA Annual Report for 1962 describes closing the GR and C.H. Wheeler plants and manufacturing GR products at BLHPA's Industrial Equipment Division at Eddystone, Pennsylvania. "Major steps were taken to improve operations at the Industrial Equipment Division. The manufacture of Griscom Russell and C.H. Wheeler products was moved to this division." The sworn May 1965 proxy statement from BLHPA to the shareholders also states that after acquisition of GR, the Industrial Equipment Division at Eddystone produced GR products.
[I]n early 1962 BLH acquired Hamilton-Thomas Corporation and its subsidiaries, Griscom-Russell Company and C.H. Wheeler Manufacturing Company. The facilities of the acquired companies were sold and the manufacture of their products *116 was transferred to the Industrial Equipment Division at Eddystone.[2]
¶ 39 Consistent with the BLHPA Annual Report for 1962, Moody's Industrial Manual for 1963 no longer lists GR as a subsidiary of BLHPA. In the 1963 Manual, there is no reference to GR and the BLHPA Industrial Equipment Division is said by Moody's "to be manufacturing evaporators and condensers, products previously manufactured by GR."[3] The Moody Manual for 1962 and 1963 also both refer to unfilled orders. In addition, an article in the 1963 Marine Engineering Log, states that BLH will, "manufacture renewal parts for the products of the companies BLH has acquired in recent months. These products include the complete line of ... Griscom-Russell sea water distillation units and heat transfer equipment."[4] The article goes on to state that BLHPA is also committed to making "improvements in the design of the products."
¶ 40 Other contemporaneous BLHPA advertisements in the Marine Engineering Log also state that BLHPA continued to manufacture and service the same products as GR. Eight months after acquiring GR, BLHPA sales manager J.J. Bolton says that BLH now makes the same products as GR produced. "We are now in the marine field with both feetadding deck machinery, steering gear, distilling plants, condensers, heat exchangers and cranes to the BLH line."[5] The advertisements in October and November of 1962 depict seawater distillation plants and the GR heat exchangers and again quote Bolton as saying, "[w]e are now in the marine field with both feet. Technical service is expanded along with our product line. We are prepared to meet your complete requirements in a far greater range of applications."
¶ 41 At some point during 1963, BLHPA developed a plan to discontinue certain product lines at the Industrial Equipment and Standard Steel Divisions, including rolling mills and small heat transfer equipment. The plan "contemplated the completion of the sales order backlog, the rearrangement of plant facilities at both divisions and the sale of certain facilities and product lines."[6] The plan did not include GR products. An internal June 1964 memo from a BLHPA executive lists the product lines that were sold, including rolling mills and value operators, the names of the buyers, and the price paid. This memo then identifies some other "products that might be sold" including "Deck *117 Machinery, Shipboard Distilling Plants, Shell and Tube Heat Exchanges, Small Feedwater Heaters." The memo creates at least a reasonable inference that BLHPA continued to manufacture GR products until at least 1964.
¶ 42 On this record, substantial evidence supports the trial court's application of the Ray factors. As to the first Ray factor, there is no dispute that the destruction of Payne's remedy against GR was caused by BLHPA's acquisition of its business. BLHPA acquired all or substantially all of GR's assets and undertook the same manufacturing operation at Eddystone.
¶ 43 The majority's analysis focuses primarily on the second Ray factor, "the successor's ability to assume the original manufacturer's risk-spreading r[o]le." Hill, 603 A.2d at 606. The majority reasons that absent proof that BLHPA actually sold GR products after the purchase, it is impossible to conclude that BLHPA assumed GR's risk-spreading role. But under Pennsylvania law, proof of sales receipts is not necessary to establish the risk-spreading role. As the successor corporation, BLHPA assumed GR's role in manufacturing GR products and the sale of GR to BLHPA transferred all the resources available to GR "for meeting its responsibilities to persons injured by defects in [its products]." Ray, 136 Cal.Rptr. 574, 560 P.2d at 9.
¶ 44 The cases the majority cites to support its analysis are distinguishable. In Jacobs v. Lakewood Aircraft Service, Inc., 512 F.Supp. 176 (E.D.Pa.1981), the successor corporation had a completely different physical plant, the corporation did not acquire all or substantially all the assets of the original company or hold itself out as the same enterprise, and it did not manufacture the original company's same product. And when the company manufactured a similar product three years later, "it did so under drastically changed circumstances; and it did not hold itself out as the same entity." Jacobs, at 184-185. In Burnside v. Abbott Laboratories, 351 Pa.Super. 264, 290, 505 A.2d 973 (1985), the successor corporation "never manufactured, promoted or marketed" the original company's product. Here, unlike in Jacobs and Burnside, BLHPA manufactured the same product, continued to service GR products, held itself out as the same enterprise, and promoted and marketed GR's products.
¶ 45 As to the third Ray factor, the trial court found that "[m]any of the GR engineers, GR design drawings, patents, trade name, and goodwill were assumed by BLH. BLH advertised that GR will continue to service GR products." Substantial evidence supports the trial court's conclusion as to third Ray factor, and the fairness of requiring BLHPA to assume responsibility for GR's products based on the acquisition of GR's name and goodwill. As in Amader v. Pittsburgh Corning Corp., 546 F.Supp. 1033 (1982), BLHPA capitalized on GR's name, reputation, and goodwill, holding itself out as an ongoing concern that continued to manufacture and service GR products.
¶ 46 Because substantial evidence supports finding Viad liable for the asbestos-related liabilities incurred by GR as the successor to BLHPA, we should affirm the trial court's decision.
NOTES
[1] Simonetta v. Viad Corp., 137 Wash.App. 15, 25, 151 P.3d 1019 (2007).
[2] Peter J. Novak is former in-house counsel for Greyhound Corporation (Viad's predecessor) and temporary head counsel of Greyhound's (subsequently dissolved) subsidiary, Baldwin-Lima-Hamilton (DE).
[3] Henry Rentschler, a former manager of Baldwin-Lima-Hamilton (PA)'s Eddystone, Pennsylvania plant, was unable to travel and testify in-person due to poor health.
[4] Payne's personal injury suit (King County No. 05-235924-2.SEA) is stayed pending this appeal.
[5] Burnside v. Simpson Paper Co., 123 Wash.2d 93, 103, 864 P.2d 937 (1994) ("An actual conflict between the law of Washington and the law of another state must be shown to exist before Washington courts will engage in a conflict of law analysis."); see also Rice v. Dow Chem. Co., 124 Wash.2d 205, 210, 875 P.2d 1213 (1994). Virtually every jurisdiction in the United States applies the same four factors to determine whether a de facto merger has occurred. See Fenderson v. Athey Prods. Corp., Kolman Div., 220 Ill.App.3d 832, 835, 163 Ill.Dec. 337, 581 N.E.2d 288 (1991).
[6] See 15 WILLIAM M. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7122 (perm ed. rev. vol.1999); Hall v. Armstrong Cork, Inc., 103 Wash.2d 258, 261-62, 692 P.2d 787 (1984).
[7] Martin v. Abbott Labs., 102 Wash.2d 581, 619, 689 P.2d 368 (1984); see also 15 WILLIAM M. FLETCHER at § 7124.20; Cashar v. Redford, 28 Wash.App. 394, 396, 624 P.2d 194 (1981); Ramirez v. Amsted Indus., Inc., 86 N.J. 332, 341-42, 431 A.2d 811 (1981) (noting that "[s]trict interpretation of the traditional corporate law approach leads to a narrow application of the exceptions to nonliability.").
[8] 15 WILLIAM M. FLETCHER at § 7041; In re Acushnet River & New Bedford Harbor, 712 F.Supp. 1010, 1015 (D.Mass.1989).
[9] Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp., 135 Wash.2d 894, 902, 906-910, 959 P.2d 1052 (1998).
[10] See generally Uni-Com NW, Ltd. v. Argus Publ'g Co., 47 Wash.App. 787, 737 P.2d 304, rev. den., 108 Wash.2d 1032 (1987).
[11] Cashar, 28 Wash.App. at 398, 624 P.2d 194 (noting a de facto merger "can only be found when the consideration given to the selling corporation for its assets is shares of the purchasing corporation's stock, rather than cash").
[12] Uni-Com NW, 47 Wash.App. at 802, 737 P.2d 304.
[13] 63 Wash.App. 561, 570, 821 P.2d 502 (1991).
[14] 614 F.2d 860 (3d Cir.1980).
[15] Johnson v. Aluminum Precision Prods., Inc., 135 Wash.App. 204, 208-09, 143 P.3d 876 (2006).
[16] Johnson v. Spider Staging Corp., 87 Wash.2d 577, 580, 555 P.2d 997 (1976).
[17] RESTATEMENT (SECOND) OF THE CONFLICT OF LAWS § 145.
[18] Zenaida-Garcia v. Recovery Sys. Tech., Inc., 128 Wash.App. 256, 260-61, 115 P.3d 1017 (2005).
[19] Johnson, 87 Wash.2d at 580-81, 555 P.2d 997.
[20] Martin v. Goodyear Tire & Rubber Co., 114 Wash.App. 823, 61 P.3d 1196 (2003).
[21] 290 Pa.Super. 15, 434 A.2d 106 (1981).
[22] E.g., Simmers v. American Cyanamid Corp., 394 Pa.Super. 464, 576 A.2d 376 (1990); Dillman v. Indiana Rolls, Inc., 67 Pa. D. & C.4th 294 (2004); Hill v. Trailmobile, Inc., 412 Pa.Super. 320, 603 A.2d 602 (1992); Conway v. White Trucks, Div. of White Motor Corp., 885 F.2d 90 (3d Cir.Pa.1989); Keselyak v. Reach All, Inc., 443 Pa.Super. 71, 660 A.2d 1350 (1995); Amader v. Pittsburgh Corning Corp., 546 F.Supp. 1033 (E.D.Pa.1982).
[23] 102 Wash.2d 581, 689 P.2d 368.
[24] See generally Dawejko, 290 Pa.Super. 15, 434 A.2d 106; Ramirez, 86 N.J. 332, 431 A.2d 811; Conway, 885 F.2d 90; Martin, 102 Wash.2d 581, 689 P.2d 368.
[25] See Ramirez, 86 N.J. at 345, 431 A.2d 811.
[26] Dawejko, 290 Pa.Super. at 19, 434 A.2d 106.
[27] Dawejko, 290 Pa.Super. at 22, 434 A.2d 106 (quoting Greenman v. Yuba Power Prods., Inc., 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 377 P.2d 897 (1963)); Ray v. Alad Corp., 19 Cal.3d 22, 30-31, 136 Cal.Rptr. 574, 560 P.2d 3 (1977).
[28] 86 N.J. at 358, 431 A.2d 811.
[29] 412 Pa.Super. 320, 603 A.2d 602.
[30] 19 Cal.3d at 30-31, 136 Cal.Rptr. 574, 560 P.2d 3.
[31] Hill, 412 Pa.Super. at 328, 603 A.2d 602 (citing Dawejko, 290 Pa.Super. at 22, 434 A.2d 106, quoting Ray, 19 Cal.3d at 30, 136 Cal.Rptr. 574, 560 P.2d 3); see also Keselyak, 443 Pa.Super. at 77, 660 A.2d 1350.
[32] 351 Pa.Super. 264, 505 A.2d 973 (1985).
[33] Martin, 102 Wash.2d at 616, 689 P.2d 368.
[34] George v. Parke-Davis, 107 Wash.2d 584, 733 P.2d 507 (1987).
[35] See e.g., In Re Thorotrast Cases, 26 Phila. Co. Rptr. 479, 497-98 (Pa.Com.Pl.1994) (discussing level of activity in the manufacture, sale, and distribution of a product a successor must engage in before they may be held liable under the product line exception).
[36] See George, 107 Wash.2d at 590, 733 P.2d 507.
[37] 512 F.Supp. 176, 183-84 (E.D.Pa.1981) (quoting Ray, 19 Cal.3d at 33, 136 Cal.Rptr. 574, 560 P.2d 3).
[38] Morales v. Crompton Knowles Corp., 888 F.Supp. 682, 687-88 (E.D.Pa.1995).
[39] Dawejko, 290 Pa.Super. at 22, 434 A.2d 106 (quoting Ray, 19 Cal.3d at 30, 136 Cal.Rptr. 574, 560 P.2d 3).
[40] The nature and extent of manufacturing equipment actually transported from GR's Massillon, Ohio site and used at BLHPA's manufacturing facilities in Eddystone, Pennsylvania remains subject to factual dispute.
[41] E.g., Martin, 102 Wash.2d 581, 689 P.2d 368; Ramirez, 86 N.J. 332, 431 A.2d 811.
[42] Hill, 412 Pa.Super. at 328, 603 A.2d 602 (citing Dawejko, 290 Pa.Super. at 22, 434 A.2d 106, quoting Ray, 19 Cal.3d at 30, 136 Cal.Rptr. 574, 560 P.2d 3) (emphasis added).
[43] 546 F.Supp. 1033, 1035-36 (E.D.Pa.1982).
[44] Amader, 546 F.Supp. at 1036 (1982).
[45] See RCW 4.28.185(5).
[46] Scott Fetzer Co. v. Weeks, 114 Wash.2d 109, 120-21, 786 P.2d 265 (1990).
[1] Novak searched corporate records and interviewed BLHPA employees in 1970 to determine whether some products were manufactured. While the court found Novak's testimony credible, the court stated that in the "absence of records and the investigation conducted a number of years later," his testimony carried far less weight than contemporaneous documentary evidence. Because of inconsistencies in Rentchler's testimony, the court accorded little, if any, weight to it.
[2] Emphasis added.
[3] Emphasis added. Viad does not challenge the trial court's finding that the manufacture of GR products moved to BLHPA's Industrial Equipment Division and Eddystone. And contrary to the characterization of the majority, the record supports the trial court's finding that "[i]n the two years after the stock acquisition, GR's Massillon, Ohio plant was dissembled and sold, but only because it consolidated operations at Eddystone, making production of GR products at Massillon unnecessary."
[4] Emphasis added.
[5] The ad continues with an interview with Bolton:

Q: Will BLH now make the same products as Griscom Russell produced?
A: Yes, but these products will now be manufactured and marketed by the Industrial Equipment Division of BLH, at Eddystone, PA.
Q: What are some of the products BLH will now produce for the marine field?
A: A few of the major ones are distilling plants, steering gear, telemotors, condensers, heat exchangers....
Q: Will these products be the same high quality as previously marketed?
A: No question about it. Former customers can anticipate the same quality, features and custom-engineered advantages as before. Of course there will be improvements because of the extended capabilities and modern facilities of BLH.
Q: Will BLH provide field service engineering and supervision?
A: Absolutely. This is an essential BLH service in any field where it is required. Here again the former personnel of Griscom-Russell, C.H. Wheeler, American Engineering and our own experienced staff should make for even better field service.
Q. Will BLH supply replacement and repair parts for existing vessels?
A: Yes. We have on file all drawing and records of Griscom-Russell, C.H. Wheeler; and American Engineering marine equipment. Key personnel who handled this work at these companies are now at BLH.
Q: Then it is true that BLH is now solidly in the marine field?
A: Yes, with both feet.
[6] The 1965 proxy statement also confirms that certain product lines were discontinued in 1963.